Slip Op. 00-28

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

_____
                                           :
SKF USA INC. and SKF GmbH,                 :
                                           :
         Plaintiffs,                       :
                                           :
         v.                                :    Court No. 99-08-00473
                                           :
UNITED STATES,                             :
                                           :
         Defendant,                        :
                                           :
THE TORRINGTON COMPANY,                    :
                                           :
         Defendant-Intervenor.             :
_____:

Plaintiffs, SKF USA Inc. and SKF GmbH (collectively "SKF"), move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging various aspects of the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled <u>Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Sweden, and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews</u> ("<u>Final Results</u>"), 64 Fed. Reg. 35,590 (July 1, 1999).

Specifically, SKF contends that Commerce erred in: (1) conducting a duty absorption inquiry under 19 U.S.C. § 1675(a)(4) (1994) for the ninth administrative review of the applicable antidumping duty order; (2) determining that it applied a reasonable duty absorption methodology and that duty absorption had in fact occurred; (3) using aggregate data of all foreign like products under consideration for normal value in calculating profit for constructed value ("CV") under 19 U.S.C. § 1677b(e)(2)(A) (1994); and (4) excluding below-cost sales from the CV profit calculation.

Commerce responds that it properly: (1) conducted a duty absorption inquiry under § 1675(a)(4); (2) used a reasonable methodology and determined that duty absorption existed; (3) calculated CV profit pursuant to § 1677b(e)(2)(A); and (4)

excluded below-cost sales from the CV profit calculation. The Torrington Company presents arguments similar to those of the defendant.

**Held:** SKF's USCIT R. 56.2 motion is denied in part and granted in part. The case is remanded to Commerce to annul all findings and conclusions made pursuant to the duty absorption inquiry conducted for the subject review.

[SKF's motion is denied in part and granted in part. Case remanded.]

Dated: March 22, 2000

Steptoe & Johnson LLP (Herbert C. Shelley and Alice A. Kipel) for SKF USA Inc. and SKF GmbH.

David W. Ogden, Acting Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Velta A. Melnbrencis, Assistant Director); of counsel: David R. Mason, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for defendant.

Stewart and Stewart (Terence P. Stewart, Wesley K. Caine, Geert De Prest and Lane S. Hurewitz) for The Torrington Company.

## OPINION

**TSOUCALAS, Senior Judge:** Plaintiffs, SKF USA Inc. and SKF GmbH (collectively "SKF"), move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging various aspects of the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From

France, Germany, Italy, Japan, Romania, Sweden, and the United
Kingdom; Final Results of Antidumping Duty Administrative
Reviews ("Final Results"), 64 Fed. Reg. 35,590 (July 1, 1999).

Specifically, SKF contends that Commerce erred in: (1)
conducting a duty absorption inquiry under 19 U.S.C. §
1675(a)(4) (1994) for the ninth administrative review of the
applicable antidumping duty order; (2) determining that it
applied a reasonable duty absorption methodology and that duty
absorption had in fact occurred; (3) using aggregate data of all
foreign like products under consideration for normal value
("NV") in calculating profit for constructed value ("CV") under
19 U.S.C. § 1677b(e)(2)(A) (1994); and (4) excluding below-cost
sales from the CV profit calculation.

Commerce responds that it properly: (1) conducted a duty
absorption inquiry under § 1675(a)(4); (2) used a reasonable
methodology and determined that duty absorption existed; (3)
calculated CV profit pursuant to § 1677b(e)(2)(A); and (4)
excluded below-cost sales from the CV profit calculation. The
Torrington Company ("Torrington") presents arguments similar to
those of the defendant.

The Court will address each of these arguments in turn.

**BACKGROUND**

On May 15, 1989, Commerce published antidumping duty orders on antifriction bearings (other than tapered roller bearings) and parts thereof ("AFBs") imported from several countries, including Germany.  See Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, and Spherical Plain Bearings and Parts Thereof From the Federal Republic of Germany, 54 Fed. Reg. 20,900.  This case concerns the ninth administrative review of the antidumping duty order on AFBs from Germany for the period of review ("POR") covering May 1, 1997 through April 30, 1998.  See Final Results, 64 Fed. Reg. at 35,590.  In accordance with 19 C.F.R. § 351.213 (1998), Commerce initiated the ninth review on June 29, 1998.  See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part, 63 Fed. Reg. 35,188.  On February 23, 1999, Commerce published the preliminary results of the ninth review.  See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Rescission of Administrative Reviews ("Preliminary Results"), 64 Fed. Reg. 8790.  Commerce published the Final Results on July 1,

1999.  <u>See</u> 64 Fed. Reg. at 35,590.

Since the administrative review at issue was initiated after December 31, 1994, the applicable law in this case is the antidumping statute as amended by the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994) (effective Jan. 1, 1995).

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a) (1994) and 28 U.S.C. § 1581(c) (1994).

## STANDARD OF REVIEW

The Court will uphold Commerce's final determination in an antidumping administrative review unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i) (1994).

## I.   Substantial Evidence Test

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 477 (1951) (quoting <u>Consolidated Edison Co.</u>

v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966) (citations omitted).    Moreover, "[t]he court may not substitute its judgment for that of the [agency] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'"    American Spring Wire Corp. v. United States, 8 CIT 20, 22, 590 F. Supp. 1273, 1276 (1984) (quoting Penntech Papers, Inc. v. NLRB, 706 F.2d 18, 22-23 (1st Cir. 1983) (quoting, in turn, Universal Camera, 340 U.S. at 488)).

## II.  Chevron Two-Step Analysis

To determine whether Commerce's interpretation and application of the antidumping statute is "in accordance with law," the Court must undertake the two-step analysis prescribed by Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  Under the first step, the Court reviews Commerce's construction of a statutory provision to

determine whether "Congress has directly spoken to the precise question at issue." Id. at 842. "To ascertain whether Congress had an intention on the precise question at issue, [the Court] employ[s] the 'traditional tools of statutory construction.'" Timex V.I., Inc. v. United States, 157 F.3d 879, 882 (Fed. Cir. 1998) (citing Chevron, 467 U.S. at 843 n.9). "The first and foremost 'tool' is the statute's text, giving it its plain meaning. Because a statute's text is Congress's final expression of its intent, if the text answers the question, that is the end of the matter." Id. (citations omitted). Beyond the statute's text, the tools of statutory construction "include the statute's structure, canons of statutory construction, and legislative history." Id. (citations omitted); but see Flora Trade Council v. United States, 23 CIT __, 41 F. Supp. 2d 319, 323 n.6 (1999) (noting that "[n]ot all rules of statutory construction rise to the level of a canon, however") (citation omitted).

If, after employing the first prong of Chevron, the Court determines that the statute is silent or ambiguous with respect to the specific issue, the question for the Court becomes whether Commerce's construction of the statute is permissible. Chevron, 467 U.S. at 843. Essentially, this is an inquiry into

the reasonableness of Commerce's interpretation. See <u>Fujitsu Gen. Ltd. v. United States</u>, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Provided Commerce has acted rationally, the Court may not substitute its judgment for the agency's. See <u>IPSCO, Inc. v. United States</u>, 965 F.2d 1056, 1061 (Fed. Cir. 1992); <u>see also</u> <u>Koyo Seiko Co. v. United States</u>, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (holding that "a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another"). The "[C]ourt will sustain the determination if it is reasonable and supported by the record as a whole, including whatever fairly detracts from the substantiality of the evidence." <u>Negev Phosphates, Ltd. v. United States Dep't of Commerce</u>, 12 CIT 1074, 1077, 699 F. Supp. 938, 942 (1988) (citations omitted). "In determining whether Commerce's interpretation is reasonable, the Court considers, among other factors, the express terms of the provisions at issue, the objectives of those provisions and the objectives of the antidumping scheme as a whole." <u>Mitsubishi Heavy Indus., Ltd. v. United States</u>, 22 CIT __, __, 15 F. Supp. 2d 807, 813 (1998).

## DISCUSSION

### I.   Commerce's Duty Absorption Inquiry

#### A.   Background

During an administrative review initiated two or four years after the "publication" of an antidumping duty order, Commerce, if requested by a domestic interested party, "shall determine whether antidumping duties have been absorbed by a foreign producer or exporter subject to the order if the subject merchandise is sold in the United States through an importer who is affiliated with such foreign producer or exporter."  19 U.S.C. § 1675(a)(4).[1]  Commerce shall notify the International Trade Commission ("ITC") of its findings regarding such duty absorption for the ITC to consider in conducting a five-year ("sunset") review under 19 U.S.C. § 1675(c), see  19 U.S.C. § 1675(a)(4), and the ITC will take such findings into account in determining whether material injury is likely to continue or recur if an order were revoked under § 1675(c), see 19 U.S.C. § 1675a(a)(1)(D).

On May 29, 1998 and July 29, 1998, Torrington requested that Commerce conduct a duty absorption inquiry pursuant to 19 U.S.C.

---

[1]  Subsection (a)(4) of 19 U.S.C. § 1675 was added to the antidumping law by the Uruguay Round Agreements Act in 1994. See Pub. L. No. 103-465, § 220, 108 Stat. 4809, 4860.

§ 1675(a)(4) with respect to various respondents, including SKF, to determine whether antidumping duties had been absorbed during the POR.  See Final Results, 64 Fed. Reg. at 35,600.  SKF and other respondents objected to such an inquiry, maintaining that Commerce was without statutory authority to conduct a duty absorption inquiry for the subject review.  See id.

In the Final Results, Commerce determined that duty absorption had occurred for the POR.  See id. at 35,601.  In asserting its authority to conduct a duty absorption inquiry under § 1675(a)(4), Commerce first explained that for "transition orders," as defined in 19 U.S.C. § 1675(c)(6)(C) (1994) (that is, antidumping duty orders, inter alia, deemed issued on January 1, 1995), regulation 19 C.F.R. § 351.213(j)(2) (1998) provides that Commerce will make a duty absorption determination, if requested, for any administrative review initiated in 1996 or 1998.  See id. at 35,600-01; 19 CFR Part 351 et al., Antidumping Duties; Countervailing Duties; Final [R]ule, 62 Fed. Reg. 27,296, 27,394 (effective June 18, 1997) (concerning 19 C.F.R. § 351.213).  Commerce, therefore, concluded that: (1) because the antidumping duty order on the AFBs in this case had been in effect since 1989, the order is a "transition order" pursuant to § 1675(c)(6)(C); and (2) since

this review was initiated in 1998 and a request was made, it had the authority to make a duty absorption inquiry for this POR. See Final Results, 64 Fed. Reg. at 35,600.

### B. Contentions of the Parties

SKF contends that Commerce lacked authority under 19 U.S.C. § 1675(a)(4) to undertake a duty absorption inquiry for this POR. See SKF's Br. Supp. Mot. J. Agency R. at 2-3, 9-15; SKF's Reply Br. at 2-13. In particular, SKF argues that for conducting such an inquiry under § 1675(a)(4), the statute clearly provides that the inquiry must occur in the second or fourth review after publication of the antidumping duty order, not in any other review. See SKF's Br. Supp. Mot. J. Agency R. at 10. SKF asserts that since Commerce conducted a duty absorption inquiry for this POR nine years after the publication of the applicable antidumping duty order (that is, May 15, 1989), the agency failed to satisfy § 1675(a)(4). See id. at 11.

Further, although SKF recognizes that the 1989 order is a "transition order" as defined under the sunset review provision 19 U.S.C. § 1675(c)(6)(C), SKF asserts that corresponding § 1675(c)(6)(D), concerning "[i]ssue date for transition orders,"

is inapplicable to a duty absorption inquiry conducted under §
1675(a)(4).  See id. at 12-15.  Specifically, SKF notes that
although § 1675(c)(6)(D) provides "a transition order shall be
treated as issued on the date the WTO Agreement enters into
force with respect to the United States" (that is, January 1,
1995), the provision expressly limits the deemed "issued date"
for transition orders to sunset reviews under § 1675(c).  SKF
argues that since § 1675(c)(6)(D)'s January 1, 1995 issuance
date does not apply to § 1675(a)(4), the "publication" date of
the order remains unchanged at May 15, 1989 and, therefore,
Commerce is precluded from initiating a duty absorption inquiry
for a review nine years after the initial publication of the
order.  See id. at 15.  SKF thereby maintains that if Commerce's
action is not authorized by statute, the agency did not have
authority to promulgate 19 C.F.R. § 351.213(j)(2) to give itself
such authority, that is, such a promulgation is ultra vires.
See SKF's Reply Br. at 11-13.

In sum, SKF argues that since nothing in the statute nor
legislative history contradicts the plain reading of §
1675(a)(4), Commerce lacked authority to conduct a duty
absorption inquiry for the ninth administrative review of the
1989 antidumping duty order and, therefore, its inquiry should

be vacated.  See SKF's Br. Supp. Mot. J. Agency R. at 2, 11.

Alternatively, SKF argues that even if Commerce possessed the

authority to conduct such an inquiry, Commerce's methodology for

determining duty absorption was flawed and contrary to law and,

accordingly, the case should be remanded to Commerce to modify

its methodology.  See id. at 3, 16-37.

Commerce responds that it properly: (1) construed §§ 1675(a)

and (c) as authorizing it to make duty absorption inquiries for

antidumping duty orders that were issued and published prior to

January 1, 1995; and (2) devised and applied a reasonable

methodology in determining the existence of duty absorption in

this case.  See Def.'s Mem. in Opp'n to Pls.' Mot. J. Agency R.

at 2, 5-25.  Commerce asserts that SKF's contention, that the

special rules under § 1675(c)(6) governing the scheduling for

sunset reviews of transition orders have no effect when Commerce

may make duty absorption findings under § 1675(a)(4), ignores

the rules of statutory construction which require that parts of

a statutory scheme should be read together so as to give effect

to the intent of Congress.  See id. at 9, 11.  In particular,

Commerce claims that the legislative history indicates that

Congress intended that the ITC would consider duty absorption

findings in all sunset reviews irrespective of whether the

antidumping orders were issued before or after January 1, 1995.
See id. at 12.   Commerce additionally claims that a strong
indication that Congress intended that the statutory provisions
regarding duty absorption and the scheduling for sunset reviews
of transition orders should be construed together is found in
the explicit reference to subsection (c) of § 1675 contained in
the last sentence of § 1675(a)(4).  See id. at 12-13.  Commerce
also contends that failure to consider these provisions
collectively would lead to absurd results because Commerce would
be precluded from making duty absorption determinations in
administrative reviews of transition orders, and the ITC would
be unable to consider duty absorption findings for sunset
reviews of hundreds of transition orders.  See id. at 13.

Torrington generally agrees with the positions taken by
Commerce.  See Torrington's Resp. to Pls.' Mot. J. Agency R. at
2-3, 10-30.  Torrington acknowledges that § 1675 addresses the
timing of sunset reviews of pre-URAA antidumping duty orders
(that is, "transition orders"), but does not directly speak to
the timing of duty absorption inquiries in the context of
administrative reviews of pre-URAA orders.  See id. at 25.
Torrington, nevertheless, argues that such an omission does not
support SKF's restrictive reading of § 1675(a)(4).  See id.

Rather, Torrington contends, inter alia, that "'[w]hether the specification of one matter means the exclusion of another is a matter of legislative intent for which one must look to the statute as a whole.'" Id. at 26 (quoting Massachusetts Trustees of E. Gas & Fuel Assocs. v. United States, 312 F.2d 214, 220 (1st Cir. 1963)). Torrington claims that the antidumping provisions taken together and the accompanying URAA legislative history show that a duty absorption inquiry is: (1) a critical factor both in the context of Commerce's determination whether dumping is likely to continue or recur and the ITC's determination whether injury is likely to continue or recur; and (2) as relevant to transition orders as it is to post-URAA orders. See id. at 19-26. Further, Torrington asserts that there is no indication in § 1675(a)(4) and § 1675(c)(6)(D), through omission or otherwise, that Congress intended to limit a duty absorption inquiry of post-URAA orders to only the second and fourth year after the issuance of such orders. See id. Torrington also asserts that the statutory omissions concerning duty absorption inquiries of pre-URAA orders have less interpretative force in the administrative setting where the Court must defer to Commerce's interpretation of the antidumping statute unless Congress has directly spoken to the question at

issue.  See id. at 25 (citation omitted).


    C.    Analysis

    The issue primarily presented is whether 19 U.S.C. § 1675(a)(4) authorizes Commerce to conduct a duty absorption inquiry for a pre-URAA antidumping duty order, that is, a transition order.

    Title 19, United States Code, § 1675(a)(4) specifically states that Commerce, if requested, shall conduct a duty absorption inquiry for any review under subsection (a) "initiated 2 years or 4 years after the publication of an antidumping duty order under section 1673e(a) of this title . . . . [Commerce] shall notify the [ITC] of its findings regarding such duty absorption for the [ITC] to consider in conducting a review under subsection (c) of this section."  See 19 U.S.C. § 1673e(a) (concerning Commerce's publication of antidumping duty order).    In addition, § 1675(c)(6)(C) provides that, for purposes of § 1675, "the term 'transition order' means . . . an antidumping duty order . . . which is in effect on the date the WTO Agreement enters into force with respect to the United States."   Section 1675(c)(6)(D) further provides that "[f]or purposes of this subsection, a transition order shall be treated

as issued on the date the WTO Agreement enters into force with respect to the United States, if such order is based on an investigation conducted by both [Commerce] and the [ITC]." The "WTO Agreement," see 19 U.S.C. § 3501(9) (1994), entered into force for the United States on January 1, 1995, see 19 U.S.C. § 3511(b) and note (1994) (Proclamation No. 6780 para. 2 (Mar. 23, 1995), in 60 Fed. Reg. 15,845).

Although the antidumping duty order in dispute is a transition order under § 1675(c)(6)(C), the Court finds that the deemed January 1, 1995 issuance date of § 1675(c)(6)(D) is inapplicable to the order.  The plain language of § 1675(c)(6)(D) specifically applies such a date "[f]or purposes of . . . subsection" (c) of § 1675, that is, for purposes of sunset reviews, rather than for duty absorption inquiries under subsection (a).  While the Court should avoid interpreting statutes that render language superfluous and should consider parts of a statutory scheme together to ascertain congressional intent, such "canons of construction are no more than rules of thumb that help courts determine the meaning of legislation, and in interpreting a statute a court should always turn first to one, cardinal canon before all others." Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253 (1992).  In particular, this Court

"must presume that a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'"  Id. at 253-54 (quoting Rubin v. United States, 449 U.S. 424, 430 (1981)); see VE Holding Corp. v. Johnson Gas Appliance Co., 917 F.2d 1574, 1579 (Fed. Cir. 1990) ("It is axiomatic that statutory interpretation begins with the language of the statute. If . . . the language is clear and fits the case, the plain meaning of the statute will be regarded as conclusive.") (citations omitted).

Because the text of § 1675(c)(6)(D) unambiguously and specifically applies the new issuance date of transition orders to subsection (c), the Court disagrees with Commerce and Torrington that subsection (a) and (c) must be read as one. Moreover, the Court finds that the last sentence of § 1675(a)(4)'s notice requisite is irrelevant because the first condition precedent of the statute, that there exists a review "initiated 2 years or 4 years after the publication of antidumping duty order," must be satisfied before conducting a duty absorption inquiry.  The Court, therefore, concludes that the publication and effective date of antidumping duty order at issue remains greater than four years, that is, May 15, 1989.

Since 19 U.S.C. § 1675(c)(6)'s special transition rules do not support Commerce's authority to conduct a duty absorption inquiry for a pre-URAA antidumping duty order, the Court must consider whether there is clear congressional intent that 19 U.S.C. § 1675(a)(4) should be applied retrospectively (as opposed to prospectively) to such an order.

In <u>Landgraf v. USI Film Prods.</u>, 511 U.S. 244 (1994), and <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997), the Supreme Court articulated the following three-part test for determining whether a statute may be lawfully be applied retrospectively. <u>See</u> <u>Craig v. Eberly</u>, 164 F.3d 490, 493-94 (10th Cir. 1998); <u>Mathews v. Kidder, Peabody & Co.</u>, 161 F.3d 156, 159-66 (3rd Cir. 1998). First, a court must "determine whether Congress has expressly prescribed the statute's proper reach," and if it has, the court must give effect to congressional will, subject only to constitutional restraints. <u>Landgraf</u>, 511 U.S. at 280. Second, if Congress did not expressly speak to the issue, the court employs normal rules of statutory construction to ascertain the statute's temporal scope. <u>See</u> <u>Lindh</u>, 521 U.S. at 326; <u>In re Minarik</u>, 166 F.3d 591, 597 (3rd Cir. 1999). Third, in situations where rules of statutory construction do not

clarify the statute's temporal scope, "the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." Landgraf, 511 U.S. at 280. If the court finds that the statute has retroactive effect, it triggers the traditional judicial "presumption against statutory retroactivity," id. at 272, "absent clear congressional intent favoring such a result," id. at 280.

The Supreme Court further clarified that "[a] statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment or upsets expectations based in prior law. Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment." Id. at 269-70 (citation and footnote omitted); see American Permac, Inc. v. United States, 191 F.3d 1380, 1381 (Fed. Cir. 1999); Travenol Lab., Inc. v. United States, 118 F.3d 749, 752-53 (Fed Cir. 1997); Goodyear Tire & Rubber Co. v. Dep't of Energy, 118 F.3d 1531, 1536-37 (Fed. Cir. 1997).

The first step under the Landgraf/Lindh test then is to look at the statutory text of the URAA and determine whether Congress has expressly prescribed whether 19 U.S.C. § 1675(a)(4) should be applied prospectively or retrospectively. Section 291 of the URAA specifies that, "[e]xcept as provided in section 261," the URAA amendments "shall take effect on . . . the date on which the WTO Agreement . . . enters into force with respect to the United States," that is, January 1, 1995, and "apply with respect to . . . reviews initiated under section 751 of [the Tariff Act of 1930]," that is, administrative reviews of determinations under 19 U.S.C. § 1675. URAA § 291(a)(2), (b), 108 Stat. at 4931; see 19 U.S.C. § 1671 note (1994) (URAA effective dates); Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995) (citing URAA § 291(a)(2), (b) (noting effective date of URAA amendments)). The Court first notes that § 261 of the URAA is inapplicable here. Second, the Court finds that § 291's language provides an "unambiguous directive," Landgraf, 511 U.S. at 263, from Congress as to the temporal reach of the URAA amendment § 1675(a)(4), specifically, that it must be applied prospectively on or after January 1, 1995 for 19 U.S.C. § 1675 reviews. Since § 291 contains an express command from Congress on the temporal reach of § 1675(a)(4), the Court

must follow it and our inquiry is done.

Accordingly, the Court finds that Commerce lacked statutory authority to conduct a duty absorption inquiry for the pre-URAA antidumping duty order at issue and, therefore, declines to address Commerce's methodology for determining duty absorption. Moreover, the Court finds that since 19 C.F.R. § 351.213(j) is inconsistent with 19 U.S.C. § 1675(a)(4), this part of the regulation is invalid. See Aerolineas Argentinas v. United States, 77 F.3d 1564, 1575 (Fed. Cir. 1996) (holding that "a regulation cannot override a clearly stated statutory enactment") (citing Brush v. Office of Personnel Management, 982 F.2d 1554, 1560 (Fed. Cir. 1992) (noting that a "regulation must be held to be invalid since it does not comport with the clear statutory mandate")); see also United States v. Larionoff, 431 U.S. 864, 873 (1977) (concluding that a regulation is valid only if it is consistent with the statute under which it was promulgated); Killip v. Office of Personnel Management, 991 F.2d 1564, 1569 (Fed. Cir. 1993) (holding that "[t]hough an agency may promulgate . . . regulations pursuant to authority granted by Congress, no such . . . regulation can confer on the agency any greater authority than that conferred under the governing statute") (citing Bowen v Georgetown Univ. Hosp., 488 U.S. 204,

208 (1988); <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 213-14
(1976)).

## II.   Commerce's CV Profit Calculation

### A.   Background

For this POR, Commerce "used CV as the basis for NV when
there were no usable sales of the foreign like product in the
comparison market." <u>Preliminary Results</u>, 64 Fed. Reg. at 8795.
Commerce calculated the profit component of CV using the
statutorily preferred methodology of 19 U.S.C. § 1677b(e)(2)(A).[2]
<u>See</u> <u>Final Results</u>, 64 Fed. Reg. at 35,611.  In applying the
preferred methodology for calculating CV profit under §
1677b(e)(2)(A), Commerce determined that the use of "an
aggregate calculation that encompasses all foreign like products
under   consideration   for   NV   represents   a   reasonable
interpretation of [§ 1677b(e)(2)(A)]."  <u>Id.</u>  Commerce also
determined that the use of such "aggregate data results in a
reasonable and practical measure of profit that [it] can apply

---

[2] Specifically, in calculating constructed value, Commerce
is required to calculate an amount for profit based on "the
actual amounts incurred and realized by the specific exporter or
producer being examined in the investigation or review . . . in
connection with the production and sale of a foreign like
product [made] in the ordinary course of trade."  19 U.S.C. §
1677b(e)(2)(A).

consistently where there are sales of the foreign like product
in the ordinary course of trade." Id. Also, in rejecting
respondents' interpretation of "foreign like product" as being
limited to the product which is identical or similar to the
subject merchandise for purposes of calculating CV profit,
Commerce reasoned as follows:

> In accordance with the definition of foreign like
> product under [19 U.S.C. § 1677(16) (1994)], it is
> clear that "foreign like product" is not limited to
> the product which is identical in physical
> characteristics to the subject merchandise ([§
> 1677(16)(A)]) or even to the product that is similar
> to the subject merchandise ([§ 1677(16)(B)]).
> Merchandise of the "same general class or kind" as the
> subject merchandise ([§ 1677(16)(C)]) will qualify as
> the "foreign like product" in cases where either the
> identical or the similar merchandise is not available.
> There is no indication that, by referring to "a
> foreign like product" in [§ 1677b(e)(2)(A)], Congress
> intended that profit be calculated upon the basis of
> merchandise that is identical or similar to the
> subject merchandise. If Congress had such intentions,
> then the "preferred" method provided in [§
> 1677b(e)(2)(A)] would rarely be applicable since CV
> ordinarily becomes necessary for determining normal
> value when identical or similar home market
> merchandise is not available for comparison to the
> U.S. merchandise.

Id. Also, in calculating CV profit under § 1677b(e)(2)(A),
Commerce excluded below-cost sales from the calculation which it
disregarded in the determination of NV pursuant to 19 U.S.C. §
1677b(b)(1) (1994). Commerce excluded such below-cost sales
because: (1) § 1677b(e)(2)(A) requires Commerce "to use the

actual amount for profit in connection with the production and sale of a foreign like product in the ordinary course of trade"; and (2) 19 U.S.C. § 1677(15) (1994) provides that below-cost sales disregarded under § 1677b(b)(1) are considered to be outside the ordinary course of trade.  Id. at 35,612.

### B.    Contentions of the Parties

SKF contends that Commerce's use of aggregate data that encompasses all foreign like products under consideration for NV for calculating CV profit is contrary to § 1677b(e)(2)(A) and to the explicit hierarchy established by § 1677(16) for selecting "foreign like product" for the CV profit calculation.  See SKF's Br. Supp. Mot. J. Agency R. at 37-58.  In addition, SKF argues, inter alia, that Commerce's CV profit calculation under § 1677b(e)(2)(A) is unlawful in that it excluded below-cost sales from the calculation.  See id. at 3-4; SKF's Reply Br. at 25-48.

Commerce responds that it applied a reasonable interpretation of § 1677b(e)(2)(A) and properly based CV profit for SKF on aggregate profit data of all foreign like products under consideration for NV.  See Def.'s Mem. in Opp'n to Mot. J. Agency R. at 2, 25-42.  Also, Commerce argues that it properly excluded below-cost sales.  See id. at 2-3, 39.  Torrington

generally agrees with Commerce.  <u>See</u> Torrington's Resp. to Pls.'
Mot. J. Agency R. at 4, 30-36.


   **C.   Analysis**

   In <u>RHP Bearings Ltd. v. United States</u>, 23 CIT ___, ___, Slip
Op. 99-134, at 9-38 (Dec. 16, 1999), this Court upheld
Commerce's CV profit methodology of using aggregate data of all
foreign like products under consideration for NV as being
consistent with the antidumping statute.  <u>See id.</u> at ___, Slip
Op. 99-134, at 32-38.  Since SKF's arguments and the methodology
at issue in this case are practically identical to those
presented in <u>RHP Bearings</u>, the Court adheres to its reasoning in
<u>RHP Bearings</u> and, therefore, finds that Commerce's CV profit
methodology and exclusion of below-cost sales to be supported by
substantial evidence and in accordance with law.


**III. Other Issues**

   We have considered SKF's other challenges to the <u>Final
Results</u>, but find them unpersuasive.

**CONCLUSION**

For the foregoing reasons, the case is remanded to Commerce to annul all findings and conclusions made pursuant to its duty absorption inquiry conducted for the subject review.  Commerce's final determination is affirmed in all other respects.

_____
NICHOLAS TSOUCALAS
SENIOR JUDGE


Dated:    March 22, 2000
          New York, New York