**Slip Op. 00-82**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

_____
                                        :
FAG ITALIA S.p.A. and FAG BEARINGS      :
CORPORATION; SKF USA INC. and           :
SKF INDUSTRIE S.p.A.,                    :
                                        :
        Plaintiffs and                   :
        Defendant-Intervenors,           :
                                        :
        v.                               :    Consol. Court No.
                                        :    97-11-01984
UNITED STATES,                          :
                                        :
        Defendant,                       :
                                        :
        and                              :
                                        :
THE TORRINGTON COMPANY,                 :
                                        :
        Defendant-Intervenor             :
        and Plaintiff.                   :
_____ :

        Plaintiffs and defendant-intervenors, FAG Italia S.p.A. and
FAG Bearings Corporation (collectively "FAG"), move pursuant to
USCIT R. 56.2 for judgment upon the agency record challenging
various aspects of the United States Department of Commerce,
International Trade Administration's ("Commerce") final
determination, entitled <u>Antifriction Bearings (Other Than Tapered
Roller Bearings) and Parts Thereof From France, Germany, Italy,
Japan, Romania, Singapore, Sweden and the United Kingdom; Final
Results of Antidumping Duty Administrative Reviews</u> ("<u>Final
Results</u>"), 62 Fed. Reg. 54,043 (Oct. 17, 1997), as amended,
<u>Antifriction Bearings (Other Than Tapered Roller Bearings) and
Parts Thereof From France, Germany, Italy, Japan, Romania,
Singapore, Sweden and the United Kingdom; Amended Final Results of
Antidumping Duty Administrative Reviews</u>, 62 Fed. Reg. 61,963 (Nov.
20, 1997). Plaintiffs and defendant-intervenors, SKF USA Inc. and
SKF Industrie S.p.A. (collectively "SKF"), as well as defendant-
intervenor and plaintiff, The Torrington Company ("Torrington"),
also move pursuant to USCIT R. 56.2 for judgment upon the agency
record challenging Commerce's <u>Final Results</u>.

        Specifically, FAG claims that Commerce erred in: (1)
calculating profit for constructed value ("CV"); (2) failing to

match United States sales to "similar" home market sales prior to resorting to CV when all home market sales of identical merchandise have been disregarded; and (3) conducting a duty absorption inquiry for the subject review.

SKF claims that Commerce erred in: (1) conducting a duty absorption investigation for the subject review; and (2) calculating CV profit.

Torrington claims that Commerce should have required SKF to report air and ocean freight expenses on a transaction-specific basis.

**Held:** FAG's USCIT R. 56.2 motion is granted in part and denied in part. SKF's USCIT R. 56.2 motion is granted in part and denied in part. Torrington's USCIT R. 56.2 motion is denied. This case is remanded to Commerce to: (1) match United States sales to similar home market sales before resorting to CV; and (2) annul all findings and conclusions made pursuant to the duty absorption inquiry conducted for this review. Commerce is affirmed in all other respects.

[FAG's motion is granted in part and denied in part. SKF's motion is granted in part and denied in part. Torrington's motion is denied. Case remanded.]

Dated: July 13, 2000

Grunfeld, Desiderio, Lebowitz & Silverman LLP (Max F. Schutzman, Andrew B. Schroth and Mark E. Pardo) for FAG.

Steptoe & Johnson LLP (Herbert C. Shelley, Alice A. Kipel and Anne Talbot) for SKF.

David W. Ogden, Acting Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Velta A. Melnbrencis, Assistant Director); of counsel: Mark A. Barnett, Stacy J. Ettinger, Myles S. Getlan and David R. Mason, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for the United States.

Stewart and Stewart (Terence P. Stewart, Wesley K. Caine, Geert De Prest and Lane S. Hurewitz) for Torrington.

OPINION

**TSOUCALAS, Senior Judge:**     Plaintiffs and defendant-intervenors, FAG Italia S.p.A. and FAG Bearings Corporation (collectively "FAG"), move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging various aspects of the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled <u>Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden and the United Kingdom; Final Results of Antidumping Duty Administrative Reviews</u> ("<u>Final Results</u>"), 62 Fed. Reg. 54,043 (Oct. 17, 1997), as amended, <u>Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden and the United Kingdom; Amended Final Results of Antidumping Duty Administrative Reviews</u> ("<u>Amended Final Results</u>"), 62 Fed. Reg. 61,963  (Nov. 20, 1997).  Plaintiffs and defendant-intervenors, SKF USA Inc. and SKF Industrie S.p.A. (collectively "SKF"), as well as defendant-intervenor and plaintiff, The Torrington Company ("Torrington"), also move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging Commerce's <u>Final Results</u>.

Specifically, FAG claims that Commerce erred in:  (1) calculating profit for constructed value ("CV"); (2) failing to

match United States sales to "similar" home market sales prior to resorting to CV when all home market sales of identical merchandise have been disregarded; and (3) conducting a duty absorption inquiry for the subject review.

SKF claims that Commerce erred in: (1) conducting a duty absorption investigation for the subject review; and (2) calculating CV profit.

Torrington claims that Commerce should have required SKF to report air and ocean freight expenses on a transaction-specific basis.

**BACKGROUND**

This case concerns the seventh review of the antidumping duty order on antifriction bearings (other than tapered roller bearings) and parts thereof ("AFBs") imported to the United States during the review period of May 1, 1995 through April 30, 1996.[1]  Commerce published the preliminary results of the subject review on June 10, 1997.   See Antifriction Bearings (Other Than Tapered Roller

---

[1] Since the administrative review at issue was initiated after December 31, 1994, the applicable law is the antidumping statute as amended by the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994) (effective January 1, 1995). See Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995) (citing URAA § 291(a)(2), (b) (noting effective date of URAA amendments)).

Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden and the United Kingdom; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Administrative Reviews ("Preliminary Results"), 62 Fed. Reg. 31,566. Commerce issued the Final Results on October 17, 1997 and amended them on November 20, 1997. See Final Results, 62 Fed. Reg. at 54,043; Amended Final Results, 62 Fed. Reg. at 61,963.

**JURISDICTION**

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a) (1994) and 28 U.S.C. § 1581(c) (1994).

**STANDARD OF REVIEW**

The Court will uphold Commerce's final determination in an antidumping administrative review unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994).

**DISCUSSION**

**I.   Commerce's CV Profit Calculation**

Commerce calculated an actual profit ratio for FAG and SKF. First, Commerce subtracted costs and expenses from the home market price in order to calculate the profit for each sale of the foreign like product in the ordinary course of trade. Commerce then

aggregated the profit for all sales at the same level of trade ("LOT") and divided this profit by the exporter's or producer's aggregate cost totals for the same sales. See Def.'s Mem. in Partial Opp'n to Pls.' Mots. J. Agency R. ("Def.'s Mem.") at 11-12 (citing Preliminary Results, 62 Fed. Reg. at 31,571).

### A.    Contentions of the Parties

FAG contends that Commerce acted contrary to the plain meaning of 19 U.S.C. § 1677b(e)(2)(A) (1994) in calculating CV profit on an aggregated "class or kind" basis while disregarding sales outside the ordinary course of trade. See FAG's Mot. J. Agency R. at 2, 4-11. FAG maintains that the statute permits Commerce to use an aggregated CV profit calculation only if no below-cost sales are disregarded in the calculation. See id. SKF makes similar arguments. See SKF's Mot. J. Agency R. at 38-57.

Commerce maintains that it applied a reasonable interpretation of § 1677b(e)(2)(A) and properly based CV profit on aggregate profit data of all foreign like products under consideration for normal value ("NV") while disregarding below-cost sales. See Def.'s Mem. at 7-20. Torrington generally agrees with Commerce. See Torrington's Resp. to FAG's and SKF's Mots. J. Agency R. ("Torrington's Resp.") at 12-15.

   B.   Analysis

   In RHP Bearings Ltd. v. United States, 23 CIT ___, 83 F. Supp.
2d 1322 (1999), this Court held, inter alia, that Commerce's CV
profit methodology, which consists of using the aggregate data of
all foreign like products under consideration for NV, is consistent
with the antidumping statute.  Since FAG's and SKF's arguments and
the methodology at issue in this case are practically identical to
those presented in RHP Bearings, the Court adheres to its reasoning
in RHP Bearings and, therefore, finds  Commerce's CV profit
methodology to be in accordance with law.  Furthermore, since the
methodology in § 1677b(e)(2)(A) explicitly requires that only sales
"in the ordinary course of trade" be included in the calculation,
and below-cost sales that were disregarded in determining NV are
not part of the "ordinary course of trade," the exclusion of below-
cost sales was appropriate.  See 19 U.S.C. §§ 1677(15) (1994),
1677b(b)(1).


**II.  Commerce's Matching United States Sales to "Similar" Home
      Market Sales Prior to Resorting to Constructed Value**

   FAG maintains that Commerce erred in resorting to CV without
first attempting to match United States sales--export price ("EP")
or constructed export price ("CEP") sales--to "similar" home market
sales in instances where all home market sales of identical
merchandise have been disregarded because they were out of the

ordinary course of trade.  See FAG's Mot. J. Agency R. at 2, 11-12.

FAG maintains that a remand is necessary to bring Commerce's

practice in line with the United States Court of Appeals for the

Federal Circuit's ("CAFC") decision in Cemex, S.A. v. United

States, 133 F.3d 897, 904 (Fed. Cir. 1998).  Commerce agrees with

FAG.  See Def.'s Mem. at 21.

The Court agrees with the parties.  In Cemex, the CAFC

reversed Commerce's practice of matching a United States sale to CV

when the identical or most similar home market model failed the

cost test.  See 133 F.3d at 904.  The CAFC stated that "[t]he plain

language of the statute requires Commerce to base foreign market

value [(now NV)] on nonidentical but similar merchandise [(foreign

like product under post-URAA law)] . . . rather than [CV] when

sales of identical merchandise have been found to be outside the

ordinary course of trade."  Cemex, 133 F.3d at 904.  In light of

the CAFC's decision in Cemex, this matter is remanded so that

Commerce can first attempt to match United States sales to similar

home market sales before resorting to CV.

## III. Commerce's Duty Absorption Inquiry

Title 19, United States Code, § 1675(a)(4) (1994) provides

that during an administrative review initiated two or four years

after the "publication" of an antidumping duty order, Commerce, if

requested by a domestic interested party, "shall determine whether antidumping duties have been absorbed by a foreign producer or exporter subject to the order if the subject merchandise is sold in the United States through an importer who is affiliated with such foreign producer or exporter."[2]    Section 1675(a)(4) further provides that Commerce shall notify the International Trade Commission ("ITC") of its findings regarding such duty absorption for the ITC to consider in conducting a five-year ("sunset") review under § 1675(c), and the ITC will take such findings into account in determining whether material injury is likely to continue or recur if an order were revoked under § 1675(c).  See 19 U.S.C. § 1675a(a)(1)(D) (1994).

On May 31, 1996 and July 9, 1996, Torrington requested that Commerce conduct a duty absorption inquiry pursuant to § 1675(a)(4) with respect to various respondents, including FAG and SKF, to determine whether antidumping duties had been absorbed during the seventh review.  See Final Results, 62 Fed. Reg. at 54,075.

In the Final Results, Commerce found that duty absorption had occurred for the subject review.  See id. at 54,044.  In asserting authority to conduct a duty absorption inquiry under § 1675(a)(4),

---

[2]  Subsection (a)(4) of 19 U.S.C. § 1675 was added to the antidumping law by the URAA in 1994.  See Pub. L. No. 103-465, § 220, 108 Stat. 4809, 4860.

Commerce first explained that for "transition orders," as defined in § 1675(c)(6)(C) (that is, antidumping duty orders, <u>inter alia</u>, deemed issued on January 1, 1995), regulation 19 C.F.R. § 351.213(j)(2)[3] provides that Commerce "will make a duty-absorption determination, if requested, for any administrative review initiated in 1996 or 1998." <u>Id.</u> at 54,074 (citing <u>19 CFR Part 351 et al., Antidumping Duties; Countervailing Duties; Final [R]ule</u>, 62 Fed. Reg. 27,296, 27,394 (May 19, 1997)). Commerce also noted that although the regulation did not bind it for this seventh AFB review, it constitutes a public statement of how Commerce construes

---

[3] The full text of 19 C.F.R. § 351.213(j) (1997) provides:

(j) <u>Absorption of antidumping duties.</u>

(1) During any administrative review covering all or part of a period falling between the first and second or third and fourth anniversary of the publication of an antidumping order under § 351.211, or a determination under § 351.218(d) (sunset review), the Secretary, if requested by a domestic interested party within 30 days of the date of publication of the notice of initiation of the review, will determine whether antidumping duties have been absorbed by an exporter or producer subject to the review if the subject merchandise is sold in the United States through an importer that is affiliated with such exporter or producer. The request must include the name(s) of the exporter or producer for which the inquiry is requested.

(2) For transition orders defined in section 751(c)(6) of the Act, the Secretary will apply paragraph (j)(1) of this section to any administrative review initiated in 1996 or 1998.

<u>Id.</u>

§ 1675(a)(4).[4]  See id.  Commerce concluded that (1) because the antidumping duty order on the AFBs in this case has been in effect since 1989, the order is a transition order pursuant to § 1675(c)(6)(C), and (2) since this review was initiated in 1996 and a request was made, Commerce had the authority to make a duty absorption inquiry for the seventh review.  See id. at 54,075.

### A.    Contentions of the Parties

FAG and SKF argue that: (1) Commerce lacked authority under § 1675(a)(4) to conduct a duty absorption inquiry for the seventh review of the 1989 antidumping duty orders; and (2) even if Commerce possessed the authority to conduct such an inquiry, Commerce's methodology for determining duty absorption was contrary to law and, accordingly, the case should be remanded to Commerce to reconsider its methodology.  See FAG's Mot. J. Agency R. at 3, 12-18; SKF's Mot. J. Agency R. at 3, 9-38.

Commerce argues it properly construed subsections (a) and (c) of § 1675 as authorizing it to make duty absorption inquiries for

---

[4] Although 19 C.F.R. § 351.213(j) is indicative of Commerce's interpretation of the URAA, the regulation does not apply here because the administrative review in this case was initiated on June 20, 1996 pursuant to a request dated May 31, 1996.  Commerce's regulations that were issued pursuant to the URAA apply only to "administrative reviews initiated on the basis of requests made on or after the first day of July, 1997."  19 CFR Part 351 et al., Antidumping Duties; Countervailing Duties; Final [R]ule, 62 Fed. Reg. 27,296, 27,416-17 (May 19, 1997).

antidumping duty orders that were issued and published prior to January 1, 1995. See Def.'s Mem. at 21-30. Commerce also asserts that it devised and applied a reasonable methodology for determining duty absorption. See id. at 30-38. Torrington generally agrees with Commerce's contentions. See Torrington's Resp. at 6-11.

### C. Analysis

In SKF USA Inc. v. United States, 24 CIT __, 94 F. Supp. 2d 1351 (2000), this Court determined that Commerce lacked statutory authority under 19 U.S.C. § 1675(a)(4) to conduct a duty absorption inquiry for antidumping duty orders issued prior to the January 1, 1995 effective date of the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465, 108 Stat. 4809 (1994). See id. at ___, 94 F. Supp. 2d at 1357-59. The Court noted that Congress expressly prescribed in the URAA that § 1675(a)(4) "must be applied prospectively on or after January 1, 1995 for 19 U.S.C. § 1675 reviews." Id. at __, 94 F. Supp. 2d at 1359 (citing § 291 of the URAA).

Because the duty absorption inquiry, the methodology and the parties' arguments at issue in this case are practically identical to those presented in SKF USA, the Court adheres to its reasoning in SKF USA. The Court, therefore, finds that Commerce did not have

the statutory authority under § 1675(a)(4) to undertake a duty absorption inquiry for the applicable pre-URAA antidumping duty order in dispute here.

## IV. Ocean and Freight Expenses

Title 19, United States Code, § 1677a(c)(2)(A) provides that EP and CEP may be reduced to account for costs "incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States." Such expenses include ocean and freight costs.

Although Commerce prefers transaction-specific reporting of such costs in order to minimize distortion, Commerce accepts reasonable allocations of such costs where transaction-specific information is unavailable. Here, SKF did not report freight costs on a transaction-specific basis and instead reported average freight cost based on weight. See Torrington's Ex. in Supp. of its Mem. in Supp. of Mot. J. Agency R. ("Torrington's Ex.") 7, SKF Section C Questionnaire Resp. at C-133 to 135. SKF devised an international freight expense rate by dividing transatlantic freight, foreign brokerage and handling, foreign inland freight and United States inland freight for shipments during the sampled time periods by the shipping weight of the merchandise during the sampled time periods. See id. The reporting of the freight

expenses was consistent with the manner in which these expenses were incurred. See id. The international freight expense rate was then applied to the per-unit shipping weight. See id. This yielded "the reported combined international freight, foreign brokerage, foreign inland freight and U.S. inland freight expenses for the [period of review]." Id.

SKF's method of calculating per-unit ocean and air freight was verified by Commerce. See Torrington's Ex. 8, SKF Verification Report at 4. In the verification report, Commerce stated the following:

> SKF calculated an international-freight rate by combining an air-freight rate and an ocean-freight rate. The ocean-freight rate was derived from ocean freight expenses (consisting of inland transportation and ocean expense minus the weight and value for shipments to Canada) divided by ocean freight weight. The air-freight rate was derived from air expense divided by air-freight weight. The expenses and weights used were based on data from the same five sample months used by SKF in calculating this factor in prior reviews. We tied total value and total weight data on worksheets to freight invoices. We verified the value and weight amounts subtracted for Canada by tracing data on freight invoices to detailed reports provided by freight carriers. The air and ocean rates were weighted by shipment weight so that the data reflected the proper ratio of air freight expense to total shipments and ocean-freight expense to total shipments. We noted that there were no customers listed on the air-freight invoices. As a further check on the accuracy of the methodology, we selected SKF France and tied worksheets to invoices and shipping reports. We found no discrepancies in the data that we reviewed.

Id.

In the <u>Final Results</u>, Commerce accepted SKF's reported air and ocean freight expenses. <u>See</u> 62 Fed. Reg. at 54,081. Commerce "found that it is generally not feasible for [SKF] to report air and ocean freight on a transaction-specific basis . . . [and, therefore,] accepted aggregated international freight data" where SKF was unable to report ocean and air freight separately. <u>Id.</u> In response to Torrington's claim that SKF's methodology could result in the distortion of freight costs, Commerce stated that it found no evidence that the methodology utilized by SKF actually distorted reported freight costs. <u>See id.</u> In conclusion, Commerce determined that because it had found that SKF acted to the best of its ability, "it would be improper to make adverse inferences about [SKF's] reported data by applying facts available simply because [SKF's] record-keeping system[] do[es] not record [its] data on a transaction-specific basis." <u>Id.</u>

**A.    Contentions of the Parties**

Torrington contends that Commerce erred by accepting SKF's reporting of air and ocean freight expenses for EP sales on an aggregate basis. <u>See</u> Torrington's Mem. in Supp. of Mot. J. Agency R. at 2. Torrington maintains that Commerce should have required SKF to report expenses for EP sales on a transaction-specific basis since transaction-specific records of international freight expenses for EP transactions were available. <u>See id.</u> Torrington

also contends that this Court's approval of Commerce's acceptance of aggregated international freight data in <u>Torrington v. United States</u> ("<u>Torrington I</u>"), 21 CIT 491, 965 F. Supp. 40 (1997), applies only to CEP sales and, therefore, Commerce should have demanded more specific reporting for the EP sales involved in the instant case. <u>See id.</u> at 9-10. Specifically, Torrington contends that "[u]nlike CEP transactions, EP transactions involve merchandise shipped directly from the foreign producer to the U.S. customer . . . [and, therefore,] transaction-specific records (or at least records for particular groups of sales) for EP transactions are generated and maintained by the producer in the ordinary course of business." <u>Id.</u> at 12. Torrington argues for a distinction in the treatment of EP versus CEP sales for the first time in its submissions to this Court. Additionally, Torrington complains that because "SKF aggregated its separate air and ocean freight factor calculations for purposes of reporting," this resulted in distortion because air freight is approximately four times more expensive than ocean freight. <u>Id.</u> at 12-14.

Commerce asks that the Court disregard Torrington's argument regarding the proposed distinction between EP and CEP sales since it was not raised during the administrative review and, therefore, Torrington failed to exhaust its administrative remedies. <u>See</u> Def.'s Mem. at 44-45. Commerce also maintains that this case is

governed by <u>Torrington I</u> regardless of whether the sales involved are EP or CEP sales.  <u>See id.</u> at 45-46.

Commerce argues that the record evidence supports its conclusion that it was not "feasible for SKF to report air freight expenses on a transaction-specific basis."  <u>Id.</u> at 46.  Responding to Torrington's contention that the failure to allocate the more expensive air freight on a transaction-specific basis "potentially" overstates United States sales, Commerce argues that its verification of SKF's reporting methodology demonstrated that the reported allocated expenses fairly represented actual expenses. <u>See id.</u> at 46-48.

Like Commerce, SKF argues that Torrington has failed to exhaust its administrative remedies with respect to its argument about the proposed distinction between EP and CEP sales.  <u>See</u> SKF's Resp. to Torrington's Mot. J. Agency R. ("SKF's Resp.") at 8.

SKF also contends that Commerce properly accepted its reported air and ocean freight expenses.  <u>See id.</u> at 11-12.  SKF maintains that the freight expenses were reported in the same manner in which they were incurred, that its methodology had been verified and accepted in previous reviews and that the reporting had been verified for the review at issue.  <u>See id.</u> at 12.

**B.    Analysis**

SKF and Commerce are correct in contending that "[i]f there exist factual or legal distinctions rendering SKF's freight methodology for EP transactions unique, then Torrington should have [raised] the EP freight expenses on the [administrative] record below."  SKF's Resp. at 9.  Torrington, however, does not present any factual or legal distinctions here to demonstrate that SKF's freight methodology, as applied to EP transactions, is unique.  All Torrington presents is the general contention that EP sales should be treated differently because they are not "typical" and the unsupported contention that transaction-specific records are maintained for such sales.  See Torrington's Mot. J. Agency R. at 12.

Because Torrington presents no persuasive reason why SKF's methodology is not equally applicable to EP sales, the Court finds that this issue is identical to ones found in this Court's previous decisions in Torrington I, 21 CIT 491, 965 F. Supp. 40 (upholding Commerce's acceptance of reported allocated freight expenses where methodology is reasonable and representative of the underlying information, and Commerce verified information); Torrington Co. v. United States ("Torrington II"), 21 CIT 686, 969 F. Supp. 1332 (1997) (same), aff'd, 156 F.3d 1361 (Fed. Cir. 1998); and Torrington v. United States ("Torrington III"), 17 CIT 967, 832 F.

Supp. 405 (1993) (same).[5]  In its previous decisions, this Court

had acknowledged Commerce's authority under certain circumstances

to accept averages rather than transaction-specific data as long as

the methodology chosen by a respondent is reasonable and supported

by information contained in the administrative record.[6]  See

Torrington I, 21 CIT at 497, 965 F. Supp. at 45; Torrington II, 21

CIT at 694, 969 F. Supp. at 1339; Torrington III, 17 CIT at 972,

832 F. Supp. at 410.  The "key issue is that [Commerce] must

closely examine the proposed methodology and make a determination

that it is reasonable and representative" of the underlying

information.  Torrington III, 17 CIT at 972, 832 F. Supp. at 410.

In Torrington I, for example, this Court sustained Commerce's

acceptance of respondent's allocation of aggregated air and ocean

---

[5]  Torrington I, Torrington II and Torrington III were decided under the law as it existed prior to the URAA amendments.  See Torrington I, 21 CIT at 496-98, 965 F. Supp. at 44-46; Torrington II, 21 CIT at 693-94, 969 F. Supp. at 1339; Torrington III, 17 CIT at 970-72, 832 F. Supp. at 408-10.  These cases, however, apply to the instant case even though it is governed by post-URAA law. There is no indication in the antidumping statute or the Statement of Administrative Action ("SAA") accompanying the statute that the new law prohibits the reporting of 19 U.S.C. § 1677a(c)(2)(A) transportation expenses on an aggregated or allocated basis.  See H.R. Doc. 103-316, at 823 (1994), reprinted in 1994 U.S.C.C.A.N. 4040.

[6]  Torrington acknowledges that this Court has already approved of Commerce's acceptance of aggregated international freight  data where a respondent could not report ocean and air freight separately and, moreover, presents no reason why this Court should depart from its previous holdings.  See Torrington's Mot. J. Agency R. at 9-10.

freight expenses because Commerce had (1) determined that "it could not link specific sales to specific shipments" and (2) "properly verified that the expenses were reasonably allocated", thus satisfying "its duty to investigate the methodology proposed by the respondent to determine whether it was 'reasonable and representative'" of the underlying information. 21 CIT at 498, 965 F. Supp. at 46.

The Court adheres to its prior decisions in Torrington I, Torrington II and Torrington III and finds that Commerce's determination was supported by substantial evidence and otherwise in accordance with law. Commerce verified that it could not link specific sales to specific shipments. In particular, Commerce found that there were "no customers listed on the air-freight invoices." Torrington's Ex. 8, SKF Verification Report at 4. Commerce also verified that the expenses were reasonably allocated. See id. Specifically, Commerce verified the accuracy and completeness of SKF's reported aggregated freight expenses and weights by "tracing data on freight invoices to detailed reports provided by freight carriers." Id. Commerce also weighted the air and ocean rates "by shipment weight so that the data reflected the proper ratio of air freight expense to total shipments and ocean-freight expense to total shipments." Id. Thus, Commerce satisfied its duty to investigate the methodology proposed by SKF and

determined that it was reasonable and representative of the underlying information.

The Court has considered Torrington's other contentions and finds that they have no merit.  Commerce is sustained.

## CONCLUSION

This case is remanded to Commerce to: (1) match United States sales to similar home market sales before resorting to CV; and (2) annul all findings and conclusions made pursuant to the duty absorption inquiry conducted for this review.  Commerce is affirmed in all other respects.

_____
NICHOLAS TSOUCALAS
SENIOR JUDGE

Dated:    July 13, 2000
          New York, New York