**FLORAL TRADE COUNCIL, Plaintiff,**

v.

**The UNITED STATES, Defendant,**

**Visaflor, S.A., Rancho Daisy, Rancho Guacatay, and Rancho Mision El Descanso, Defendant–Intervenors.**

**Court No. 92–06–00393.**

United States Court of International Trade.

May 25, 1993.

Stewart & Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr. and Amy S. Dwyer, Washington, DC, for plaintiff.

Stuart E. Schiffer, Acting Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Marc E. Montalbine; Office of Chief Counsel for Import Admin., U.S. Dept. of Commerce, Patrick V. Gallagher, Jr., of counsel, Washington, DC, for defendant.

Porter, Wright, Morris & Arthur, Leslie Alan Glick, Washington, DC, for defendant-intervenor, Visaflor, S.A.

Katten Muchin Zavis & Dombroff, James M. Lyons, Washington, DC, for defendant-intervenors, Rancho Daisy, Rancho Guacatay, and Rancho Mision El Descanso.

## OPINION

RESTANI, Judge:

This matter is before the court on plaintiff's Rule 56.1 motion for judgment upon the agency record. This is a challenge to the final results of the fourth administrative review of an antidumping order. *Certain Fresh Cut Flowers from Mexico*, 57 Fed.Reg. 19,597 (Dep't Comm.1992) (final results of antidumping duty admin. review) (hereinafter *"Final Results"*). Plaintiff, Floral Trade Council ("FTC"), protests the decision of the International Trade Administration ("ITA") to calculate a single unified antidumping duty rate, which would be applied to all shippers, both old and new, who did not receive their own individual rates in either the original less than fair value ("LTFV") investigation or a subsequent administrative review.

For the five producers named in the administrative review, ITA was satisfied with the data submitted by the producers, finding no need to base calculations on best information available ("BIA"). *See* 19 U.S.C. § 1677e(c) (1988). For the two producers whose home market sales were below their cost of production ("COP"), ITA based foreign market value ("FMV") on constructed value ("CV"). FTC challenges ITA's verification procedure and its methodology in calculating CV to determine the rate for one of the producers, Rancho Mision el Descanso ("Rancho Mision"). As the only positive rate, and therefore, the highest rate calculated, Rancho Mision's rate, according to current ITA practice, would apply to all future entries made by producers who did not receive their own rate.

## BACKGROUND

In accordance with 19 CFR § 353.22(a)(1) (1992), FTC requested an administrative review for three producers/exporters of fresh cut flowers from Mexico: Rancho del Pacifico, Rancho Daisy, and Rancho Mision. The review covered production of standard carnations, standard chrysanthemums, and pompon chrysanthemums for the period April 1, 1990 through March 31, 1991. Two other producers, Rancho Guacatay and Visaflor, asked to be included in the review. All five producers submitted questionnaire responses to ITA.

On November 1, 1991, FTC requested a COP investigation for Rancho Daisy, Visaflor and Rancho Mision. ITA rejected FTC's untimely COP allegations against Visaflor. Rancho Daisy and Rancho Mision responded to the COP questionnaires sent by ITA.

In its COP questionnaire response, Rancho Mision allocated various costs. ITA's verification report indicated that the agency was able to reconcile Rancho Mision's COP responses for various costs with the appropriate accounting records or source documents. It was unable, however, to verify by means of the general ledger the cultivation-area allocation methodology used in the COP response. Visual identification of cultivation area was also hampered by the fact that, at the time of verification, Rancho Mision had converted many of its greenhouses from the production of carnations to the production of other flowers. ITA stated, however, that by using methods other than strict visual inspection, it was able to verify cultivation area as reported by Rancho Mision. It accepted Rancho Mision's cost allocation as an appropriate method for estimating the cost of cultivating the carnations.

As Rancho Mision was the only producer receiving a positive rate in this review, ITA designated its rate as the cash deposit for future entries of all other shippers who did not receive an individual duty rate. The 18.20% "all other" rate calculated in the LTFV investigation was discarded.

FTC challenged ITA's adoption of a unified rate in a previous action before this court. *Floral Trade Council v. United States*, 16 CIT ——, 799 F.Supp. 116 (1992) (*"Floral Trade I"*). In that case, this court noted that the industry was extremely fragmented, with new producers entering the

market frequently, and it is difficult for Customs to determine which producers are new shippers. *Id.* at ——, 799 F.Supp. at 118. Therefore, this court determined that "[a]ssuming that no statutory or regulatory barriers to use of a single rate exist," ITA's decision to utilize a single rate to avoid administrative difficulties appears to be practical and justified. *Id.* Although FTC did not allege a conflict with ITA's regulation, the court expressed skepticism regarding ITA's interpretation of the plain language of 19 C.F.R. § 353.22(e)(2) and a concern that not all relevant arguments had been made on the issue. *Floral Trade I,* 16 CIT at —— n. 2, 799 F.Supp. at 119 n. 2. Thus, the court declined to hold that ITA's new approach was consistent with its regulation. *Id.* at —— & n. 2, 799 F.Supp at 119 & n. 2. Rather, the court held that ITA was not precluded for purposes of that case from using one "all other" rate for "old" and "new" shippers. *Id.* at ——, 799 F.Supp. at 120. In this case, unlike the previous one, FTC challenges the regulation outright and both domestic and exporting interests are participating. Thus, the issue is now squarely presented. The court will first address this issue, then turn to the challenge to verification procedures.

## DISCUSSION

### I. *Use of Unified "All Other" Rate*

█ FTC challenges ITA's new procedure for setting an "all other" rate on several bases: 1) administrative ease is an insufficient reason to change a long-standing practice relied upon by domestic producers; 2) ITA failed to provide notice of the proposed change and an opportunity for interested parties to comment; 3) shippers, anticipating lower "all other" rates, will be less likely to participate in subsequent administrative reviews to obtain an individual rate, thereby placing an undue burden on domestic producers to identify shippers who should be reviewed; and 4) Congress specifically instructed ITA to establish regulations to provide for the automatic assessment of duties when a review is not requested.

### A. *Long-standing Practice of Dual Rates*

It was ITA's long-standing practice to calculate an "all other" rate in the original LTFV determination. *Certain Fresh Cut Flowers from Mexico,* 55 Fed.Reg. 12,696, 12,699 (Dep't Comm.1990) (final results of antidumping duty admin. review). The rate would apply to all producers currently active in that market who did not receive an individual rate in the investigation. ITA continued to apply that rate to future shipments of "old shippers" unless those firms received an individual rate in a subsequent administrative review. *Floral Trade I,* 16 CIT at ——, 799 F.Supp. at 118. Firms that began exporting to the United States after the last day of the review period, so-called "new shippers," were assigned the highest verified rate of any reviewed firm in the administrative review. *Id.* at ——, 799, F.Supp. at 118; *see Certain Fresh Cut Flowers,* 55 Fed.Reg. at 12,700.

ITA consistently followed this practice until it issued its determination in *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France,* 56 Fed.Reg. 11,178 (Dep't Comm.1991) (prelim. results of antidumping duty admin. reviews). In that review, ITA did not assign the highest non-BIA rate in the review to new exporters only. Rather, that rate was now designated as the "cash deposit rate for *all other* manufacturers/exporters." *Id.* at 11,-181 (emphasis added). Prior to this determination, the agency neither announced its intention to change the procedure nor solicited comments on the effects of the change. When later challenged, ITA's major justification for the change was that the Customs Service was experiencing administrative difficulties in distinguishing shippers that qualified under the "all other" rate from those covered by the "new shipper" rate. *Floral Trade I,* 16 CIT at ——, 799 F.Supp. at 118; *Certain Circular Welded Carbon Steel Pipes and Tubes From Thailand,* 57 Fed.Reg. 38,-668, 38,671–72 (Dep't Comm.1992) (stating that for administrative reasons, ITA did not have the option of reverting to the previous practice). FTC argues that agency convenience, *without more, is not a sufficient basis* to change a long-standing procedure. The

domestic industry, FTC contends, relies upon the existence of an 18.20% "all other" rate in deciding whether to request a review and which companies to include in its request.

ITA itself admits that the dual rate practice was in effect for a substantial period of time. In fact, it was only in April 1990, during the first administrative review in *Certain Fresh Cut Flowers*, that ITA denied the request of five respondents for revision of the "all other" rate on the basis of new margins established in the current administrative review. 55 Fed.Reg. at 12,699. It was ITA's position then that application of the LTFV "all other" rate to companies that did not request a review was a "long-standing practice ... upheld by the Court of International Trade." *Id.* Yet, only one year later, ITA changed its practice to the one suggested by those five respondents, claiming administrative necessity.[1] At that time ITA did not explain why applying the new shipper rate was more appropriate than use of the "all other" rate from the original LTFV investigation or some other rate, such as a new averaged rate.[2] *See Floral Trade I*, 16 CIT at ——, 799 F.Supp. at 119. ITA has still not explained why the "new shipper" rate is the appropriate rate, even for new shippers.

### B. *Notice of Change and Opportunity for Comment*

ITA changed its practice without notice or opportunity for comment by interested parties. ITA argues that the practice is an interpretative rule not subject to the notice and comment requirements of the Administrative Procedure Act ("APA"). *See Timken Co. v. United States*, 11 CIT 786, 805–06, 673 F.Supp. 495, 514 (1987); 5 U.S.C. § 553(b)(A) (1988). Interpretative rules either clarify or explain existing law, rather than creating new law, rights, or duties. They indicate what the administrative officer thinks the statute or regulation means. *Timken*, 11 CIT at 805–06, 673 F.Supp. at 514 (citations omitted). Here, ITA does not explain what aspect of the statute or regulation the rule interprets.[3] Of course, if the "rule" is in conflict with an applicable regulation, it may not stand.

### C. *Prejudice to Domestic and Foreign Producers*

ITA claims the domestic industry is not prejudiced by its methodology because if a domestic producer believes that a particular "all other" deposit rate does not accurately depict current pricing practices for firms not covered by an individual rate, it may request an administrative review of particular firms. The burden may be inappropriately distributed in this situation. On the one hand, it seems reasonable to place the burden for requesting a review on those parties who have better access to the information necessary to challenge a duty assessment, i.e., the foreign producers. Furthermore, domestic producers do not always have the resources to pursue action against every foreign producer engaged in dumping activities and in this case it is difficult to tell which specific

1. In reviewing the relevant administrative determinations, the court notes, as did FTC, that ITA has been somewhat inconsistent, at least initially, in its practice of assigning a single rate for "all other" shippers. In some cases, ITA continued to apply two rates. *See, e.g., Color Television Receivers, Except for Video Monitors, from Taiwan*, 56 Fed.Reg. 31,378, 31,387 (Dep't Comm. 1991) (final results of antidumping duty admin. review). In others, a unified rate was assigned, but it was not the highest verified rate for any reviewed firm in the current review, and there was no explanation of how the rate was derived. *See, e.g., Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Certain Components Thereof, from Japan*, 56 Fed.Reg. 65,228, 65,240 (Dep't Comm.1991) (final results of antidumping duty admin. review); *3.5″ Microdisks and Coated Media Thereof from Japan*, 56 Fed. Reg. 36,768, 36,773 (Dep't Comm.1991); *Television Receivers, Monochrome and Color, from Ja-*

*pan*, 56 Fed.Reg. 16,069, 16,072 (Dep't Comm. 1991) (final results of antidumping admin. review). It would seem that inconsistent application of any practice would create more of an administrative burden than a consistent application of a dual rate structure.

2. In this case, because only one rate was calculated, there is nothing to average. ITA's new methodology does not seem to permit averaging in a case with several calculated rates, however.

3. In *Timken*, for example, this court found that the agency's practice of disregarding below-cost sales that represent less than ten percent of total home market sales in effect constitutes an interpretation of the term "substantial quantities" in 19 U.S.C. § 1677b(b)(1). *Timken*, 11 CIT at 806, 673 F.Supp. at 514.

producers are the source of concern. Also, the legislative history suggests that the U.S. government should share more of the burden if an industry has already demonstrated that it has been injured by foreign dumping. H.R.Rep. No. 725, 98th Cong., 2d Sess. 24 (1984), *reprinted in* 1984 U.S.C.C.A.N. 5127, 5151.

On the other hand, in this fragmented industry of numerous small producers, many foreign producers are not in a position to challenge an unfair deposit rate. ITA has not provided an explanation as to why, in this situation, the *highest* rate calculated in the review should apply to all uninvestigated producers. ITA's new methodology may drive small producers out of the market by assessing an unreasonably high deposit rate, which the producers are not in a position to oppose. Although the main concern of foreign producers and importers may be the stability of rates, the court assumes that such producers and importers are also concerned with avoiding vastly inappropriate deposit rates based on some other party's "highest rate." [4] Presumably any methodology should strive for a balance in the burdens it imposes upon parties with competing interests. It is not clear to the court that ITA has made a reasonable attempt to achieve this balance.

### D. Congressional Acquiescence

ITA claims that, although Congress has amended 19 U.S.C. § 1673e, concerning assessment of duty, twice since 1981, there has been no attempt to change ITA's practice of not applying the LTFV "all other" rate to all companies without an individual rate. ITA interprets this to mean that Congress has acquiesced in ITA's interpretation that the antidumping statute does not require application of the LTFV rate to all firms without an individual duty rate. *See Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969) (stating that an agency construction of a statute should be given great weight, especially when "Congress has refused to alter the administrative construction"). While a weak argument might be made that Congress agrees that new shippers need not receive the LTFV rate, congressional silence might

also be interpreted to mean acquiescence in ITA's long-standing practice of applying the LTFV rate to old uninvestigated shippers. The court does not rely on either acquiescence view.

### E. The Regulation

The court agrees with ITA that the statute, the legislative history, and the regulations do not prescribe the methodology for calculating the "all other" rate in original LTFV determinations. *See National Knitwear & Sportswear Ass'n v. United States,* 15 CIT 548, ———————, 779 F.Supp. 1364, 1368–69 (1991) (discussing 19 U.S.C. § 1673d(a)(1) (1988) and 19 U.S.C. § 1673e(a)(1) (1988)). The statute is also not entirely clear as to the degree to which the original LTFV determination should continue to apply after an annual review to companies which have not participated in the review. *See* 19 U.S.C. § 1675(a) (1988). The legislative history states, however, that ITA "should provide by regulation for the assessment of antidumping and countervailing duties on entries for which review is not requested, including ... the conversion of cash deposits of estimated duties, previously ordered." H.R.Rep. No. 1156, 98th Cong., 2d Sess. 181 (1984), *reprinted in* 1984 U.S.C.C.A.N. 5220, 5298.

The regulation 19 C.F.R. § 353.22(e) details the process for assessing duties for parties not involved in an administrative review. The regulation reads as follows:

(e) *Automatic assessment of duty.*

(1) For orders, if the Secretary does not receive a timely request [for administrative review] ..., the Secretary, without additional notice, will instruct the Customs Service to assess antidumping duties on the merchandise ... at rates equal to the cash deposit of, or bond for, estimated antidumping duties required on that merchandise at the time of entry, or withdrawal from warehouse, for consumption and to continue to collect the cash deposits previously ordered.

(2) If the Secretary receives a timely request [for administrative review] ...,

---

4. While this is not the case here, it is a concern as to general application of this new rule.

the Secretary in accordance with paragraph (e)(1) of this section will instruct the Customs Service to assess antidumping duties, and to continue to collect the cash deposits, on the merchandise not covered by the request.

19 C.F.R. § 353.22(e) (1992). In promulgating the final version of the regulation, ITA explained, "[i]f no review of particular entries is requested ..., the cash deposit rate becomes the "fixed" rate, and the entries will be liquidated at that rate." *Antidumping Duties,* 54 Fed.Reg. 12,742, 12,757 (Dep't Comm.1989) (final rule). ITA reasoned, "[b]ecause the cash deposit (or bond) rate is the basis for each interested party's decision whether to exercise its right to request a review, it would make no sense to change the rate after the time for request has expired." *Id.* at 12,756.

ITA did not adhere to this interpretation in *Floral Trade I.* It argued instead that the language in § 353.22(e)(2), which directs the Customs Service to "continue to collect the cash deposits" for unreviewed companies, does not refer to "the cash deposits previously ordered," mentioned in § 353.22(e)(1). *See Floral Trade I,* 16 CIT at ——, 799 F.Supp. at 119. Refusing to equate "cash deposits" with "cash deposits previously ordered" would allow the Customs Service to collect duty deposits based on a cash deposit rate determined after an annual review rather than at an original LTFV determination. As indicated, the court in *Floral Trade I* was not entirely convinced by ITA's argument. *Id.*

ITA has now abandoned the strained reading it adopted in *Floral Trade I,* and contends that the regulation simply does not apply to the "all other" rate. This is a new position and it is inconsistent with the position previously taken before this court and with the position ITA espoused at the time it promulgated the regulation. As 19 C.F.R. § 353.22(e) does not by its terms exclude "all other" rates from its coverage, the court now concludes that § 353.22(e) prevents abandonment of LTFV "all other" rates for "old

shippers," which have never been investigated or reviewed. As indicated in the previous sections, the statute, past practice, and concerns of fairness do not compel the position taken by defendant in this action.[5] Accordingly, ITA's regulation is valid, and it applies in this situation to "old" shippers without individual rates.

## II. *Verification Procedures in Determining Constructed Value*

■ The second issue in this action involves ITA's verification at Rancho Mision. The purpose of the antidumping statute is "determining current margins as accurately as possible." *Rhone Poulenc, Inc. v. United States,* 899 F.2d 1185, 1191 (Fed.Civ.1990). According to 19 C.F.R. § 353.36(a)(iv) (1992), ITA is required to verify all factual information relied on in the final results of an administrative review. Verification may include a review of all producer files and records, and questioning of personnel, insofar as they are considered relevant to the investigation. *See* 19 C.F.R. § 353.36(c). Verification is an audit process that selectively tests the accuracy and completeness of a respondent's submissions. *Bomont Indus. v. United States,* 14 CIT 208, 209, 733 F.Supp 1507, 1508 (1990). If the agency is unable to verify, within a specified time period, the accuracy and completeness of the information submitted, the agency will use BIA. 19 C.F.R. § 353.-37(a)(2) (1992).

FTC argues that ITA is charged with calculating reasonable, accurate dumping margins based on verifiable allocation of costs where insufficient actual price or cost data is available. According to FTC, ITA's inability to verify directly all of Rancho Mision's reported costs or the data underlying its cultivation-area allocation methodology required ITA to resort to BIA. FTC contends that record data does not support ITA's claim that it was able to verify Rancho Mision's response by alternative means. FTC claims, *inter alia,* that cultivation area devoted to carnations can only be substantiated by confirming that areas within the greenhouses

---

**5.** The court does not reach the issue of statutory constraints. Also, the parties advised the court that similar issues are being considered in *Feder-*

*al–Mogul Corp. v. United States,* No. 92–06–00422.

devoted to other flower types remained constant.

Congress has afforded ITA a degree of latitude in implementing its verification procedures. *PPG Indus., Inc. v. United States,* 15 CIT ——, ——, 781 F.Supp. 781, 787 (1991) (citing *Kerr–McGee Chem. Corp. v. United States,* 14 CIT 344, 362, 739 F.Supp. 613, 628 (1990)). The decision to select a particular method of verification rests solely within the agency's sound discretion. *Hercules, Inc. v. United States,* 11 CIT 710, 726, 673 F.Supp. 454, 469 (1987). If a reasonable standard is applied and the verification is supported by substantial evidence, the court will sustain the methodology. *Id.*

Although ITA was not able to verify each item submitted in Rancho Mision's questionnaire, the approach the agency took in its verification procedure was reasonable and adequate under these circumstances. There is no evidence that any of the information sought during the verification process was inadequate or suspect. In the time period allotted for verification, ITA was able to conduct a physical inspection of the production areas, and to review source documents to verify questionnaire responses for numerous elements necessary to calculate constructed value.

There is a good deal of confusion about whether Rancho Mision used a correct cost allocation method, because it appears to use other allocation methods for other purposes. Allocation is necessarily an inexact science, and is simply a way to *estimate* the costs incurred by the firm to manufacture the product, complete the process, or deliver the service. Allocation methods vary even among firms in the same industry. The simplest and most reasonable cost allocation method in this instance appears to be cultivation area, as utilized by Rancho Mision in its questionnaire response.[6] In calculating constructed value, ITA is obligated to allocate various costs, expenses, and profit to the products subject to investigation. *See* 19 U.S.C. § 1677b(e)(1) (1988); *IPSCO, Inc. v. United States,* 12 CIT 384, 387, 687 F.Supp.

633, 635 (1988). ITA apparently believed cultivation-area cost allocation was reasonable, leading to a relatively accurate calculation of dumping margins.

The court does not agree with FTC's contention that Rancho Mision's changeover in production, prior to the verification, precluded ITA from accepting Rancho Mision's response regarding cultivation area dedicated to standard carnations. Surely, FTC recognizes that over the course of time, there can, and will be, changes in production and/or layout. This should not necessarily result in rejection of a respondent's cost data, particularly if ITA is confident that it can reconstruct the necessary information from other materials available and determine within reasonable limits the accuracy of the response. From the record, it appears that, despite the recent changeover in greenhouse production, ITA was sufficiently satisfied with the physical inspection and data regarding number of plants purchased and sold, shipments, dimensions of greenhouses, and number of beds, to conclude that Rancho Mision's questionnaire response regarding cultivation area for standard carnations was fairly accurate. There appears to be no reason to disregard ITA's determination on this point. Nor does the court find reason to challenge ITA's acceptance of Rancho Mision's explanation for changes in its methodology. If ITA finds information submitted by a respondent "to be complete and its explanations sound, it may need no further information." *PPG Indus.,* 15 CIT at ——, 781 F.Supp. at 787 (quoting *Kerr–McGee,* 14 CIT at 362, 739 F.Supp. at 628).

The court finds ITA's determination as to constructed value to be based on substantial evidence on the record, and otherwise in accordance with law.

## CONCLUSION

ITA must apply 19 C.F.R. § 353.22 to construct the rate for "old" unreviewed shippers. In all other respects the determination is sustained. ITA is to report its final re-

---

6. If restricting allocation to greenhouse area rather than total area is detrimental to anyone, it is to defendant-intervenor because carnations

represented a larger portion of the greenhouse area than of the total cultivation area.

sults in thirty days. If no objections are filed within ten days thereof, the determination shall be sustained.