**Slip Op. 01-22**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: RICHARD W. GOLDBERG, JUDGE**

)))))))))))))))))))))))))))))))))))))),
HEVEAFIL SDN. BHD., and       *
FILATI LASTEX SDN. BHD.,       *
      *
            Plaintiffs,    *
      *
            v.        *       Court No. 98-04-00908
      *
THE UNITED STATES,       *
      *
            Defendant.    *
      *
      *
))))))))))))))))))))))))))))))))))))))-

[Court sustains in part and remands in part.]


                   Dated: February 27, 2001


      White & Case (Walter J. Spak, David E. Bond and Edward Meyers) for plaintiffs Heveafil Sdn. Bhd. and Filmax Sdn. Bhd.

      White & Case (Walter J. Spak and Richard G. King and Edward Meyers) for plaintiff Filati Lastex Sdn. Bhd.

      Stuart E. Shiffer Deputy Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; (Lucius B. Lau), Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice; Office of the Chief Counsel for Import Administration, United States Department of Commerce (Mildred E. Steward), of counsel, for defendant.

OPINION

**GOLDBERG, Judge:** In this action, the Court reviews a challenge to the Department of Commerce's ("Commerce") final results for the fourth administrative review of the antidumping order covering extruded rubber from Malaysia.  See Extruded Rubber Thread from Malaysia; Final Results of Antidumping Duty Administrative Review, 63 Fed. Reg. 12,752 (March 16, 1998)("Final Results"). The Final Results covered entries during the period of review ("POR") October 1, 1995 through September 30, 1996.

Plaintiffs Heveafil Sdn. Bhd. and Filmax Sdn. Bhd. ("Heveafil") and Plaintiff Filati Lastex Sdn. Bhd.("Filati") both argue that the Final Results were neither in accordance with law nor supported by substantial evidence.

The Court exercises jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c)(1994).  The Court sustains in part and remands in part.

**I.**
**BACKGROUND**

On October 7, 1992, Commerce published an antidumping duty order on extruded rubber thread from Malaysia.  See Antidumping Duty Order and Amendment of Final Determination of Sales at Less Than Fair Value:  Extruded Rubber Thread from Malaysia, 57 Fed. Reg. 46,150 (October 7, 1992).  Heveafil and Filati are Malaysian producers of extruded rubber thread.  At the request of Heveafil, Commerce initiated the fourth administrative review on November 15, 1996.  See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in Part, 61

Fed. Reg. 58,513 (November 15, 1996).

On December 16, 1996, North American Extruded Rubber Thread, a U.S. producer of extruded rubber thread, requested that Commerce conduct a duty absorption study with regard to all respondents in the administrative review.  See Def.'s App. for Def.'s Mem. in Opp'n to the Rule 56.2 Mot. for J. on the Agency R. Filed by Filati Lastex Sdn. Bhd. ("Commerce's Filati App.") at 3 (Letter of 12/16/96 from Peter Koenig to U.S. Sec. of Commerce).

During the administrative review, Heveafil and Filati timely responded to all of Commerce's questionnaires and requests for information.  Commerce conducted verification on Heveafil's and Filati's U.S. and Malaysian sales responses and both companies' cost responses in July and August of 1997.  On November 7, 1997, Commerce published the preliminary determination for the fourth review.  See Notice of Preliminary Results of Antidumping Duty Administrative Review: Extruded Rubber Thread From Malaysia, 62 Fed. Reg. 60,221 (November 7, 1997)("Preliminary Results").  In the Preliminary Results, after finding that Heveafil failed verification, Commerce assigned Filati a dumping margin of 36.36 percent and assigned Heveafil an adverse facts available dumping margin of 54.13 percent.  See id.

Commerce issued the Final Results on March 16, 1998.  See 63 Fed. Reg. at 12,752.  In the Final Results Commerce maintained its position with regard to the dumping margins.  See id. at 12,753.  Commerce further determined that Heveafil and Filati

would absorb the antidumping duties assessed on entries during the POR because they offered no evidence to rebut the presumption of duty absorption that attaches to positive dumping determinations.  See id. at 12,757.

## II.
## STANDARD OF REVIEW

The Court will sustain Commerce's Final Results if they are supported by substantial evidence on the record and are otherwise in accordance with law.  See 19 U.S.C. § 1516(b)(1)(B)(1994).

To determine whether Commerce's interpretation of a statute is in accordance with law, the Court applies the two-prong test set forth in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  Chevron first directs the Court to determine "whether Congress has directly spoken to the precise question at issue."  See id. at 842.  To do so, the Court must look to the statute's text to ascertain "Congress's purpose and intent."  Timex V.I., Inc. v. United States, ___ Fed. Cir.(T) __, __, 157 F.3d 879, 881 (1998) (citing Chevron, 467 U.S. at 842-43 & n.9).  If the plain language of the statute is not dispositive, the Court must then consider the statute's structure, canons of statutory interpretation, and legislative history.  See id. at 882 (citing Dunn v. Commodity Futures Trading Comm'n, 519 U.S. 465, 470-80 (1997); Chevron, 467 U.S. at 859-63; Oshkosh Truck Corp. v. United States, 123 F.3d 1477, 1481 (Fed. Cir. 1997)).  If, after this analysis, Congress's intent is unambiguous, the Court must give it effect.  See id.

If the statute is either silent or ambiguous on the question at issue, however, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." Chevron, 467 U.S. at 843 (footnote omitted). Thus, the second prong of the Chevron test directs the Court to consider the reasonableness of Commerce's interpretation. See id.

With respect to Commerce's factual findings, the Court will uphold the agency's factual findings if they are supported by substantial evidence. "Substantial evidence is something more than a 'mere scintilla,' and must be enough reasonably to support a conclusion." Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 405, 636 F.Supp. 961, 966 (1986) (citations omitted), aff'd, 5 Fed. Cir. (T) 77, 810 F.2d 1137 (1987). In applying this standard, courts must sustain Commerce's factual determinations so long as they are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusions. See Atlantic Sugar, Ltd. v. United States, 2 Fed. Cir. (T) 130, 137, 744 F.2d 1556, 1563 (1984).

**III.**
**DISCUSSION**

**A.    Commerce's Determination to Assign Heveafil a Dumping Margin Based on Facts Otherwise Available is Sustained.**

During an administrative review, Commerce must conduct a verification if it determines that "good cause" for verification exists. See 19 C.F.R. § 353.36(a)(iv)(1994). After such verification, Commerce may decline to consider cost information

provided by a respondent and use facts otherwise available if the respondent fails to provide evidence supporting its reported information.  <u>See</u> 19 U.S.C. §§ 1677e, 1677m(e), 1677m(i)(1994).

Here, in conjunction with the fourth administrative review, Commerce required Heveafil to provide information on cost of production ("COP") and constructed value ("CV").  <u>See</u> Def.'s App. for Def.'s Mem. in Opp'n to the Rule 56.2 Mot. for J. upon the Agency R. Filed by Heveafil Sdn. Bhd. and Filmax Bhd. ("Commerce's Heveafil App.") at 4 (Letter of 12/18/96 from Thomas F. Futtner to Walter J. Spak)("Futtner Letter").  This information was necessary for Commerce to make a dumping determination under the statute.  <u>See</u> 19 U.S.C. §§ 1677b(b)(1), 1677b(b)(3)(A), 1677b(e)(1994).  After examining the responses and determining that verification was necessary, Commerce conducted verification on site in Malaysia.  <u>See</u> <u>Preliminary Results</u>, 62 Fed. Reg. at 60,221.

Heveafil disputes Commerce's determination that it failed verification.  <u>See</u> Br. of Pls. Heveafil Sdn. Bhd. and Filmax Sdn. Bhd, in Supp. of Their Mot. for J. Upon the Agency R. ("Heveafil Br.") at 12-15.  Heveafil's main challenge centers on Commerce's treatment of its bill of materials ("BOMs") evidence.  <u>See</u> <u>id.</u> at 13-14.

At verification, Commerce sought to examine, among other records, the BOMs that Heveafil claimed contained its cost information.  Heveafil maintains that its BOM system records the combination of materials, and their corresponding per-unit costs,

used in the production of particular types of rubber thread to ensure that Heveafil products have a consistent quality.  See Heveafil's Br. at 12-15.  Heveafil alleges that it maintained all of its BOMs in a computer database at its office in Malaysia. See id.

In preparation for verification, Heveafil downloaded the relevant BOM onto a computer disk which was provided to Heveafil's counsel in order to file a response to the antidumping questionnaire.  See Pls. Heveafil Sdn. And Filmax Sdn. Bhd.'s App. Pursuant to USCIT R.56.2(c)(1)(3) for Br. in Supp. of its Mot. for Summ. J. Upon the Agency R. ("Heveafil's App.") at 3 (Verification of Cost of Production (COP) and Constructed Value (CV) Data in the 1995-1996 Antidumping Duty Admin. Review of Extruded Rubber Thread from Malaysia ("Cost Verification Mem.")). During verification, Commerce refused to examine a copy of the BOM that Heveafil had downloaded to a disk because it was not a document "generated in the ordinary course of business during the POR and located at the verification site."  See Cost Verification Memo.  Heveafil first informed Commerce at the verification that the original BOMs had been purged from the computer system.  See Final Results, 63 Fed. Reg. at 12,762.

The Court finds that Commerce acted within its discretion in determining that Heveafil failed verification.  "Congress has implicitly delegated to Commerce the latitude to derive verification procedures ad hoc."  See Micron Tech. Inc. v. United States, 117 F.3d 1386, 1396 (Fed. Cir. 1997); see also Floral

Trade Council v. United States, 17 C.I.T. 392, 399, 822 F.Supp 766, 772 (1993)("The decision to select a particular method of verification rests solely within the agency's sound discretion."). Further, the Court of International Trade has already approved Commerce's policy of rejecting verification documentation that was not generated "in the ordinary course of business." Koenig & Bauer-Albert AG v. United States, 22 C.I.T. __, __, 15 F.Supp.2d 834, 845 (1998); see also AK Steel Corp. v. United States, 21 C.I.T. __, __, 988 F.Supp. 594, 601 (1997). Here, the BOM offered by Heveafil was not generated within the ordinary course of business. See id. At best, it was an unauthenticated duplicate of a database which may have been generated within the ordinary course of business. Heveafil also offers no evidence demonstrating that it could not have maintained the BOM in its original state pending verification. See Heveafil Br., at 12-15.

Commerce, moreover, did not base its verification decision solely upon the BOM evidence. See Final Results, 63 Fed. Reg. at 12,762-63. Despite Heveafil's claims to the contrary,[1] the record supports Commerce's assertion that during verification it made an effort to verify Heveafil's responses using alternative

---

[1] See Pls. Heveafil Sdn Bhd.'s and Filmax Sdn. Bhd.'s Reply to Def.'s Mem. in Opp'n to Their Rule 56.2 Mot. for J. Upon the Agency's R. ("Heveafil's Reply Br.") at 4. Heveafil argues that Commerce refused to utilize underlying production records to substantiate the BOM. See id. Yet Heveafil fails to offer any evidentiary support for this claim. See id. Commerce, however, presented evidence that it attempted to complete verification using alternative documentation, but was unable to do so. See Cost Verification Mem.

sources of documentation.  See Cost Verification Mem.; Final Results, 62 Fed. Reg. at 12,762 (describing that the 1996 Budgeting Report was not presented in its entirety and that the partial Budgeting Report and inventory records could not be reconciled).

Heveafil also challenges Commerce's decision to reject the cost responses in toto, after Heveafil failed verification of "product specific direct material costs."  See Heveafil Br. at 15.  Although there are circumstances in which Commerce must utilize "partial facts available," there is no clear statutory guidance regulating such utilization.  See Rautaruuki Oy v. United States, Slip Op. 98-112, 1998 WL 465219,*7 (CIT Aug. 4, 1998)(finding that a Commerce determination to reject a respondent's responses in their entirety is valid if decision is reasoned and supported by the evidence).  In the Final Results, Commerce reasoned that its practice is "to reject a respondent's submitted information in toto when flawed and unverifiable cost data renders all price-to-price comparisons impossible."  63 Fed. Reg. at 12,763.

Heveafil argues that the unverified data was only one portion of the cost calculations.  See Heveafil's Br. at 15. Hypothetically accepting Heveafil's argument does not carry the issue.[2]  The costs that Heveafil argues could have been

---

[2] Heveafil's argument that Commerce should have used partial facts available only with respect to direct material costs, see Heveafil Br. at 15, also fails because Heveafil did not exhaust administrative remedies.  See 28 U.S.C. § 2637(d)(1994); Asociacion Colombiana de Exportadores de Flores v. United States,

independently verified[3] make up only a portion of the COP and CV calculation. It is clear to the Court that unverifiable product-specific direct material costs would prevent any meaningful accurate cost calculation.

**B. Commerce's Determination to Assign Heveafil a Dumping Margin Using Adverse Inferences is Sustained.**

Heveafil challenges Commerce's decision to utilize "adverse inferences" in assigning Heveafil a dumping margin. See Heveafil's Br. at 15-26. Commerce may only assign a dumping margin using adverse inferences if Commerce is unable to verify submitted data and the respondent fails to cooperate by "not acting to the best of its ability." See 19 U.S.C. § 1677e(b) (1994). In the Final Results, Commerce explained that Heveafil had not cooperated in the verification and failed to act to the best of its ability because (1) it had previous experience with antidumping reviews, (2) it possessed the data Commerce was unable to verify, and (3) it would benefit from its own lack of cooperation.[4] See 63 Fed. Reg. at 12,762.

---

22 C.I.T., __,__,6 F.Supp.2d 865, 890 (1998). Here, Heveafil failed to argue the point in its administrative case brief. See Commerce's Heveafil App. at 12 (Letter of 12/17/1997 from Walter J. Spak and David E. Bond to William M. Daley ("Heveafil's Adm. Case Br.")).

[3] The costs Heveafil claims could have been verified include "direct labor costs, variable and fixed overhead costs, general and administrative expenses, and financing expenses." See Heveafil Br. at 15.

[4] While the Court considers that benefiting from a lack of cooperation may be a valid indicator that a respondent failed to cooperate to the best of its ability, here there is no reliable direct evidence that Heveafil would, or intended to, benefit from not cooperating. See Final Results, 63 Fed. Reg. 12,752;

The Court finds that Commerce's determination concerning Heveafil's cooperation was in accordance with law and supported by substantial evidence.  Although Heveafil personnel may have experienced some confusion as to whether the BOM would satisfy Commerce's inquiry, such potential confusion does not excuse Heveafil's improper preparation for the verification.  Commerce informed Heveafil, far in advance of verification, that it wished to review all "source documents."  See Futtner Letter at G-5 ("Identify any source documents maintained in the normal course of business you have relied on in preparing your response, and specify the locations where such documents are maintained.").  Because the proffered BOM was at best a duplication of an original document, the Court finds that it is not a source document as it was never maintained in the ordinary course of business.

The Court also agrees with Commerce that inasmuch as Heveafil has undergone verification in the past, it should have understood that a copy of the BOM was unacceptable as a source document.  See Final Results, 63 Fed. Reg. at 12,762 ("Heveafil has participated in each of the prior reviews, as well as the original less than fair value (LTFV) investigation."); Gourmet Equipment (Taiwan) Corp. v. United States, Slip Op. 00-78, 2000 WL 977369, *4 (CIT)("Past participation may be relevant to notice, knowledge and reliance issues."); accord Antifriction

---

Heveafil's Br. at 20; Def.'s Mem. in Opp'n to the R. 56.2 Mot. for J. Upon the Agency R. Filed by Heveafil Sdn. Bhd. and Filmax Bhd. ("Commerce's Heveafil Br.") at 37.

Bearings (Other Than Tapered Roller Bearings) and Parts Thereof

from France, et al.; Final Results of Antidumping Duty

Administrative Reviews, 62 Fed. Reg. 2,081, 2088 (January 15,

1997)(considering past experience of a petitioner to be relevant

to its capacity to understand verification requirements in a

subsequent review).

Additional evidence of Heveafil's failure to act to the best

of its ability is the fact that a full six months after Heveafil

received notice about maintaining its source documents, it

deleted the relevant BOM data from its computer system.  See

Heveafil Adm. Case Br.  This evidence supports the determination

that Heveafil did not cooperate to the best of its ability

because after receiving notice from Commerce, it knew or should

have known to maintain the source document.  The Court finds that

the foregoing evidence is substantial evidence in support of

Commerce's determination.

**C.    Commerce's Selection of Heveafil's Adverse Facts Available
       Dumping Margin is Sustained.**

In the Final Results Commerce assigned Heveafil a dumping

margin of 54.31 percent.  In assigning this dumping margin,

Commerce reasoned that the selected dumping margin is appropriate

because, being the highest rate calculated in a prior

administrative review, it "reflects the business practice

occurring in the rubber thread industry."  See Final Results, 63

Fed. Reg. at 12,763.

Heveafil challenges Commerce's selection of the 54.31

percent dumping margin on three grounds: (1) that Commerce failed

to give Heveafil credit for its cooperation; (2) that the dumping margin was not applied in conformance with past practice; and (3) that Commerce failed to corroborate its evidence;  See Heveafil's Br. at 22-27.  All of Heveafil's arguments fail.

Once it determines that it is appropriate to assign adverse facts available, Commerce has discretion in choosing a specific dumping margin.  See 19 U.S.C. §§ 1677e(b)(1)-(4)(1994); Statement of Administrative Action, P.L. 103-465, 103d Cong., 2d sess. 870, reprinted in 1994 U.S.C.C.A.N. 3773 ("SAA").  Commerce may use information from the petition, the original investigation, a previous review, or any other information on the record.  See 19 U.S.C. §§ 1677e(b)(1)-(4).  This discretion is not without limit, however, as Commerce must corroborate the dumping margin that it selects.  See id. at 870.

Heveafil is correct that Commerce has assigned less adverse facts available in circumstances where it has determined that a respondent has been sufficiently "cooperative."  See e.g., Roller Chain, Other Than Bicycle From Japan: Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review, 63 Fed. Reg. 25,450, 25,453 (May 8, 1998)("Roller Chain").  The Court is of the opinion, however, that these previous policy choices do not legally constrain Commerce to assign Heveafil a more advantageous dumping margin here.

Most importantly, Commerce did not conclude that Heveafil offered sufficient cooperation.  See Final Results, 63 Fed. Reg. at 12,763; cf.  Roller Chain, 63 Fed. Reg. at 25,454.  Although

Heveafil may be able to offer some evidence supporting the contention that it cooperated,[5] Commerce has provided sufficient evidence demonstrating that Heveafil did not cooperate in verification. See Final Results, 63 Fed. Reg. at 12,763; see supra, § B.

Heveafil next argues that Commerce applied its adverse inference methodology in an inconsistent manner vis á vis Heveafil and a respondent in the third review, Rubberflex. See Heveafil Br., at 23-24. Assuming arguendo that this is true, Heveafil offers no legal rule informing how Commerce is constrained in applying adverse facts available to respondents that may be similarly situated. See id. Without such guidance, the Court declines the invitation to make new law.

Finally, Commerce has corroborated the dumping margin within the meaning of the statute. The SAA states that corroboration "means that the agencies will satisfy themselves that the secondary information to be used has probative value." SAA at 870. Here, Commerce reasoned that the 54.31 percent dumping margin is appropriate, as the highest rate calculated in a prior administrative review of this proceeding, because it "reflects the business practices occurring in the rubber thread industry." See Final Results, 63 Fed. Reg. at 12,763. Although the Court considers this reasoning to be less than comprehensive, past

---

[5] Heveafil claims that it "substantially cooperated in this review and has a history of cooperating in the original antidumping investigation and the last three administrative reviews." See Heveafil Br. at 22. Yet Heveafil offers no evidence or citation to support its contention. See id.

industry dumping margins do have probative value as indicators of present industry practices.[6]  See, e.g., D&L Supply Co. v. United States, 113 F.3d 1,220, 1,223 (Fed. Cir. 1997).  Therefore the Court concludes that Commerce has successfully corroborated the dumping margin.

**D.   Commerce's Determination Regarding Heveafil and Filati's Duty Absorption is Remanded.**

A duty absorption inquiry evaluates whether a respondent, or U.S. affiliate, internalizes an assessed duty instead of passing it on to the first unaffiliated U.S. purchaser as a higher price. See 19 U.S.C. § 1675(a)(4)(1994).  The statute mandates that Commerce conduct a duty absorption inquiry upon request and report its findings to the International Trade Commission.  See id.  Filati and Heveafil argue that in evaluating duty absorption in this case, Commerce applied an erroneous methodology, and that the determination is therefore not supported by substantial

---

[6] Heveafil argues that Rubfil's rate is not probative because Rubfil is a much smaller company than Heveafil, with fewer sales in the United States.  See Heveafil's Br. at 27-28. The Court, however, does not agree with Heveafil that the size of a particular respondent or the size of its U.S. sales, alone, are dispositive as to the probative nature of a selected dumping margin.  Likewise, despite Heveafil's protestations to the contrary, Borden, Inc., v. United States, 22 C.I.T. __, __, 4 F.Supp.2d 1,221, 1,247 (1998) does not control the corroboration analysis here.  After stating that Commerce cannot apply a dumping margin using "information which has been thoroughly discredited," the Borden court found that the margin selected by Commerce was not shown to be reliable.  See id.  Here, the plaintiff has not presented any evidence demonstrating that the selected dumping margin was "thoroughly discredited." Furthermore, in Borden the court made a point of distinguishing rates which might be probative to high end versus low end producers.  See id. at 1,247.  Here, there is no evidence that supports such a distinction.

evidence.  See Br. of Pl. Filati Lastex Sdn. Bhd. in Support of
its Mot. for J. Upon the Agency R. ("Filati Br.") at 13-16;
Heveafil Br. at 29-32.

The Court declines to reach the question of the legality of
Commerce's duty absorption methodology.  Rather, the Court finds
that Commerce did not have the statutory authority to conduct a
duty absorption inquiry.  The Court of International Trade has
previously addressed the issue of whether Commerce may conduct
duty absorption inquiries of antidumping orders issued before
January 1, 1995.  See SKF USA Inc. v. United States, 24 C.I.T.
__, __, 94 F.Supp.2d 1351, 1357-59 (2000); FAG Italia S.P.A. v.
United States, Slip. Op. 00-82, 2000 WL 978462, * 4 (CIT 2000).
The Court has determined that any antidumping duty order
published before January 1, 1995,[7] is a "transition order" under
the statue.  See 19 U.S.C. 1675(c)(6)(D)(1994); SKF, 94 F.Supp.2d
at 1357.  The court in SKF, however, also held that the January
1, 1995 issue date deemed by § 1675(c)(6)(D) was inapplicable to
the transition order at issue because § 1675(c)(6)(D)
"specifically applies such a date '[f]or purposes of sunset
reviews, rather than for duty absorption inquires under
subsection (a).'"  See SKF, 94 F.Supp.2d at 1357.

In this case, the antidumping order was published on October
7, 1992.  Because the order was published before January 1, 1995,

---

[7] January 1, 1995 is the date that the World Trade
Organization Agreement entered into force in the United States
See 19 U.S.C. § 3511(b) & n. (1994)(Proclamation No. 6780 para. 2
(March 23, 1995), in 60 Fed. Reg. 15,845).

and because the duty absorption inquiry in this case is substantially identical to that at issue in SKF, the Court adheres to the reasoning of SKF.  94 F.Supp.2d at 1,357-59. Therefore, the issue is remanded to Commerce for action in conformance with the holding of SKF.  See id.

**E.    Commerce's Determination of Filati's Constructed Export Price Sales is Sustained.**

Filati claims that Commerce improperly considered sales it made to unaffiliated U.S. customers as constructed export price ("CEP") sales when it should have treated them as export price ("EP") sales.  See Filati Br. at 7-12.

Commerce's policy has been to consider sales to be EP sales if:

> (1) The merchandise in question was shipped directly from the manufacturer to the unrelated buyer, without being introduced into the inventory of the related shipping agent; (2) direct shipment from the manufacturer to the unrelated buyers was the customary commercial channel for sales of this merchandise between the parties involved; and (3) the related selling agent in the United States acted only as a processor of sales-related documentation and a communication link with the unrelated U.S. buyers.

Certain Corrosion-Resistant Carbon Flat Products From Korea, 61 Fed. Reg. 18,547, 18,551 (April 26, 1996).  Filati claims that its sales met these requirements.  See Filati Br. at 7-12. Commerce claims that they did not.  See Def.'s Mem. in Opp'n to the Rule 56.2 Mot. for J. Upon the Agency R. Filed by Filati Lastex Sdn. Bhd. ("Commerce's Filati Br.") at 19-25.

The Court agrees with Commerce.  The record evidence is sufficient to support Commerce's determination.  Filati does

point to some evidence that supports its position that Filati's U.S. affiliate operated as no more than a "paper pusher."  See Filati Br. at 9 (citing Pl. Filati Lastex Sdn. Bhd.'s App. Pursuant to USCIT 56.2(c)(1)(3) for Br. in Supp. of its Mot. for Summ. J. Upon the Agency R. ("Filati App.") at 8 (Letter of 12/22/97 from Walter J. Spak and Richard G. King to William M. Daley).  Any single piece of evidence, however, does not control Commerce's inquiry.  See Atlantic Sugar, 744 F.2d at 1563.

In the Final Results Commerce presented substantial evidence supporting its determination that Filati's U.S. affiliate performed functions that went beyond a simple processor of sales related documentation and as a communication link with the unrelated U.S. buyers.  See Final Results, 63 Fed. Reg. at 12,759.  Most importantly, Commerce established that Filati admitted that its U.S. affiliate negotiated the terms of sale. See id. ("[Filati's] U.S. affiliate makes the initial contact with the U.S. customer, negotiates terms of sale, contacts Filati to arrange for production and shipment of the container to the United States, and issues the final invoice to, and collects payment from, the customer." (citing Def.'s App. for Def.'s Mem. in Opp'n to the R. 56.2 Mot. for J. upon the Agency R. Filed by Filati Lastex Sdn. Bhd. ("Commerce's Filati App.") at 4 (Letter of 2/20/97 from Walter J. Spak, William J. Clinton and Richard G. King to William Daley ("Letter of 2/20/97") at A-9, A-10). All of these sales-related activities, most importantly the evidence of price negotiation, go beyond mere paper pushing.  See U.S. Steel

<u>Group B A Unit of USX Corp. v. United States</u>, 22 C.I.T. __, __, 15 F.Supp.2d 892, 903 (1998) <u>rev'd on other grounds</u>, 225 F.3d 1284) (Fed. Cir. 2000) (U.S. affiliate's role in negotiating prices pushed the "sale over the edge into the CEP rather than the EP category.").

In challenging Commerce's determination, Filati claims that Commerce should not be allowed to change its position regarding EP sales from prior review periods when it relies on a factual record that is substantially the same. <u>See</u> Filati Br. at 9-11. Filati fails to recognize, however, that this is a record filled with contradictions. For example, there is record evidence that Filati's U.S. affiliate did negotiate for price, <u>see</u> Letter of 2/20/97, at A-9, A-10, and there is record evidence that Filati's affiliate did not negotiate for price. <u>See</u> Filati's App. at 5 (U.S. Sales Verification, Exh. 5, Fiche 131, Frames 1-15). In such a situation, the Court finds it reasonable that Commerce might treat conflicting information differently during different periods of review.[8]

**F.   Commerce's Determination to Deny Filati a CEP Offset is Sustained.**

In the <u>Final Results</u> Commerce refused to grant Filati a CEP offset based upon Filati (USA)'s selling functions. <u>See</u> 63 Fed. Reg. at 12,754. Commerce reasoned that Filati's CEP sales were at the same level of trade as Filati's home market sales. <u>See</u>

---

[8] Filati has also failed to supply any support for its contention that Commerce is prohibited from changing a position based on the same evidence. <u>See</u> Filati Br. at 7-12; Filati's R. Br. at 1-4.

<u>id.</u> Filati challenges this decision, arguing that in denying Filati an EP classification, <u>see</u> <u>supra</u> § E., Commerce found that Filati (USA) performed "significant" selling functions yet incompatibly failed to find a difference in the level of trade between Filati's home market and CEP channels. <u>See</u> Filati Br. at 12. Commerce claims that the Court should not reach the merits of this issue because Filati failed to exhaust administrative remedies. <u>See</u> Commerce's Filati Br. at 26-27. The Court agrees with Commerce.

It is a basic tenet of administrative law, and the jurisprudence of the Court of International Trade, that courts have the power to require exhaustion of administrative remedies. <u>See</u> 28 U.S.C. § 2637(d)(1994); <u>Unemployment Compensation Commission of Territory of Alaska v. Aragan</u>, 329 U.S. 143, 155 (1946); <u>Wirth Limited v. United States</u>, 22 C.I.T. __, __, 5 F. Supp.2d 968, 983 (1998); <u>Bethlehem Steel Corp. v. United States</u>, 22 C.I.T., __, __, 27 F.Supp.2d 201, 208 (1998).

In this case, after Commerce determined in the <u>Preliminary Results</u> not to grant Filati a CEP offset, Filati failed to object to Commerce's determination within the contemplated administrative structure. <u>See</u> <u>e.g.</u>, Commerce's Filati App. at 9 (Letter of 12/17/97 from Walter J. Spak and Richard G. King to William M. Daley (attaching Filati's case brief)).

It is true that the Court may proceed to the merits even if a party has failed to exhaust administrative remedies. <u>See,</u> <u>e.g.</u>, <u>Manifattura Emmepi S.p.A. v. United States</u>, 16 C.I.T. 619,

621 & n.3, 799 F.Supp. 110, 113 & n.3 (1992).  Here, however, the

Court does not see cause for taking exception.[9]

**G.    Commerce's Comparison of Filati's U.S. Sales to First
       Quality Home Market Sales is Sustained.**

Filati challenges Commerce's decision to exclude Filati's

second-quality home market sales for purposes of cost comparison.

See Filati's Br. at 16-18.  Filati argues that such a decision

impermissibly leads to a comparison of Filati's first and second

quality U.S. sales to only Filati's first quality normal value

("NV") sales.  See id.

Under the statute, Commerce bases NV on "the price at which

the foreign like product is first sold (or in the absence of

sale, offered for sale) for consumption in the exporting country,

in the usual commercial qualities, and in the ordinary course of

trade and, at the same level of trade as the export price or

constructed export price . . . . " 19 U.S.C. §

1677b(a)(1)(B)(i)(1994)(emphasis added).  The statute expressly

considers two types of sales to be outside the ordinary course of

trade: sales below the cost of production, and sales between

affiliated persons where the value does not fairly reflect the

---

[9]  Filati argues that the Court should proceed to the merits despite its failure to exhaust administrative remedies because "it would have been futile for Filati to have raised the issue in its case brief," and because the issue is purely legal.  See Pl. Filati Lastex Sdn Bhd.'s Reply Br. to Def.'s Mem. in Opp'n to the Mot. of Pl. Filati Lastex Sdn. Bhd. for J. Upon the Agency R. ("Filati Reply Br.") at 4, 5.  There is, however, nothing to suggest, besides Filati's bare words, that an argument Filati made during the administrative process would have been futile. Further, the inquiry is not purely legal since the CEP offset may have been granted if Filati was able to point to record evidence that the selling functions were different.

amount usually reflected in sales of merchandise under consideration.  See 19 U.S.C. §§ 1677(15)(A),(B)(1994).

In the Final Results, after Commerce determined that the subject home market sales were both below the cost of production and in small quantity, it complied with the law in refusing to consider such sales in a cost analysis because they were outside the ordinary course of trade.  See 19 U.S.C. § 1677b(a)(1)(B)(i); Final Results, 63 Fed. Reg. at 12,757.

Filati does not challenge Commerce's determination that the sales were made below the cost of production.  See Filati Br. at 16-18.  Rather, Filati argues that although Commerce may disregard below-cost sales, it should not do so if such sales represent obsolete or end-of-model-year merchandise.  See id. at 17 (citing SAA at 833).[10]  Filati's argument fails, however, because Commerce did not conclude, and the Court does not now find, that the sales at issue represented obsolete or end-of-model year merchandise.  See Final Results, 63 Fed. Reg. at 12,755, 12,757.  Filati's claim that the merchandise was of limited quantity does not make it obsolete or end-of-model year, or worthy of some analogous classification.  See SAA at 833.  The only evidence Filati offers -- that three of the four invoices

---

[10] "[I]n some cases, below-cost sales may be used to determine normal value if those sales are obsolete or end-of-model-year merchandise.  Such merchandise is often sold at less than cost as was recognized in the legislative history of the Trade Act of 1974. It is appropriate to use these sales as the basis of normal value when the merchandise exported to the United States is similarly obsolete or end-of-model year."  SAA at 833 (citation omitted).

were created during end of year stock inventory, see Filati Br.
at 17 -- certainly does not control Commerce's classification.
See Atlantic Sugar, 744 F.2d at 1,563 (explaining that courts
examine evidentiary record as a whole, not just isolated
evidence).  Further, the SAA provision cited by Filati is clearly
discretionary.  See SAA 833 ("[I]n some cases, below-cost sales
may be used . . ..").  Accordingly, the Court sustains Commerce's
determination in this regard.

**H.    Commerce's Determination Regarding Filati's Second Quality
        Below Cost Sales and Constructed Value Calculation is
        Sustained.**

In the Final Results, Commerce declined to consider Filati's
second quality below-cost sales in its calculation of CV profit.
See 63 Fed. Reg. at 12,752.  Commerce reasoned that these sales
failed the cost test, and thus were outside the ordinary course
of trade.  See id.  Filati challenges the decision, claiming that
the sales should not be considered outside the ordinary course of
trade, because they are analogous to obsolete or year-end sales.
See Filati Br. at 18, (citing 19 U.S.C. § 1677b(b)(1)(1994)
("[S]uch sales may be disregarded in the determination of normal
value.")(emphasis added).

The Court sustains Commerce's determination as to the
treatment of second-quality below-cost sales in the calculation
of CV profit.  Commerce's decision is based on its determination
that the sales in question were outside the ordinary course of
trade.  As with NV calculation, described in detail supra, § G.,
Commerce has the discretion to decide whether it will use sales

outside the ordinary course of trade in a CV calculation. See 19 U.S.C. §§ 1677b(b)(1), 1677b(e)(2)(A)(1994). Filati has not offered any evidence that Commerce abused its discretion in not considering the below cost sales here. See Filati Br. at 18-19; Filati Reply Br. at 11-12. Therefore, Commerce's determination in this respect is sustained.

**I. Commerce's Determination Not to Utilize Filati's Reported Cost Data is Sustained.**

Filati challenges Commerce's determination not to accept the cost data it originally offered. See Filati Br. at 19-26. Instead of accepting Filati's reported numbers, Commerce required Filati to provide its average per-unit standard costs for each product, its POR production (first and second quarter) for each product, and variances. See Final Results, 63 Fed. Reg. at 12,760-61; Filati's Br. at 19, 20. Filati argues that Commerce erred by rejecting its reported data because Commerce must accept data that is in accordance with accounting norms, reasonable and not distortive. See Filati Br. at 24.

It is established Commerce practice to accept a respondent's cost data when it represents a respondent's normal records, is consistent with accounting norms, and is not distortive. See 19 U.S.C. 1677b(f)(1)(A)(1994);[11] see, e.g., Final Determination of Sales at Less Than Fair Value: Furfuryl Alcohol from South

---

[11] The SAA requires that Commerce "consider whether the producer historically used its submitted cost allocation methods to compute the cost of the subject merchandise prior to the investigation or review and in the normal course of its business operation." SAA at 835 (emphasis added).

Africa, 60 Fed. Reg. 22,550, 22,556 (May 8, 1995); SAA 834-35. Here, Commerce accepts that the data was consistent with accounting norms and was not distortive, but Commerce refuses to accept that the reported data was part of Filati's "normal records."   See Final Results, 63 Fed. Reg. at 12,760-61; Commerce's Filati Br. at 39.

The Court agrees with Commerce.  The record demonstrates that Filati admitted that its original cost response was "adapted" or altered for purposes of responding to Commerce's questionnaire.  See Commerce's Filati App. at D-24 (Letter of 04/12/97 from Walter J. Spak and Richard G. King to William M. Daley)("For purposes of this response, we have adapted this standard cost accounting system to calculate the reported cost of manufacture.").  Moreover, Filati concedes this point in its brief.  See Filati's Br. at 19, 21.  As such, Commerce acted in accordance with law when it decided that such data did not represent Filati's normal records.  See Furfuryl, 60 Fed. Reg. at 22,556.  Thus, Commerce's determination in this regard is sustained.

**J.   Commerce's Determination to Deny Filati an Offset to Indirect Selling Expenses Related to Cash Deposits is Sustained.**

Filati challenges Commerce's decision to deny an offset to U.S. indirect selling expenses to account for the opportunity cost associated with financing cash deposits of antidumping and countervailing duties.  See Filati Br. at 26-30.  Filati claims that in the past Commerce allowed such an offset and that Commerce has recently changed its position without adequate

explanation.  See id.

Filati is correct that in the past Commerce has allowed such offsets.  See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from France, et al., 62 Fed. Reg. 54,043, 54,079 (October 17, 1997)(detailing past practice). Commerce changed its position, however, in 1997.  See id. (explaining change in policy).

The Court is satisfied that Commerce has adequately explained its change in position,[12] and that the current position is reasonable under the statute.  See 19 U.S.C. § 1677a(d)(1)(1994); SAA at 823; Final Results, 63 Fed. Reg. at 12,758.  The statute does not define "indirect selling expenses." See 19 U.S.C. § 1677a(d)(1).  Thus, the Court reviews Commerce's interpretation of this term with appropriate Chevron deference. See 467 U.S. at 843.

It is reasonable for Commerce to take the position, in conformance with the Court of International Trade's decision in NTN Bearing, that "financing expenses incurred on antidumping duty cash deposits are not the inevitable consequence of the antidumping duty order."  NTN Bearing, 104 F.Supp.2d at 138. Such a position is reasonable because the finance expense associated with cash deposits is truly not an inevitable consequence of an antidumping order. Cf. Daewoo Elecs. Co., Ltd.

_____

[12] It is well established that Commerce may change its position as long as it provides adequate explanation for such a change.  See NTN Bearing Corp. of America v. United States, 24 C.I.T. __, __, 104 F.Supp.2d 110, 138 (2000)(citing Timken Co. v. United States, 21 C.I.T. __, __, 989 F.Supp. 234, 250 (1997)).

v. United States, 13 C.I.T. 253, 270, 712 F.Supp. 931, 947-48 (1989) (legal fees were inevitable consequence of antidumping order); rev'd on other grounds, 6 F.3d 1511 (Fed. Cir. 1993), cert. denied, 512 U.S. 1204 (1994). A finance expense is not inevitable because a respondent may choose to pay the cash deposit through a variety of means. Just as a consumer can decide not to incur credit card finance charges by paying cash, a respondent has the choice to fund the cash deposits through various means.

**K.    Commerce's Determination Regarding Filati's Normal Value Calculation is Sustained.**

Filati claims that Commerce acted outside of the law in applying the novel NV calculation method set forth by the Federal Circuit to the review after the closure of the agency briefing period. See Filati's Br. at 30-33. The Federal Circuit opinion at issue is Cemex v. United States, 133 F.3d 897 (Fed. Cir. 1998). In Cemex, the Federal Circuit instructed Commerce to base NV on home market sales of similar merchandise rather than proceeding to CV. See id. Filati does not dispute Commerce's duty to apply the NV methodology outlined in Cemex. See Filati Br. at 30-33; Filati's Reply. Br. at 17-18. Rather, Filati argues that it was never given notice or opportunity to comment on the new methodology. See Filati Br. at 30.

It is the Court's opinion that Commerce did proceed improperly. In the interest of fairness Commerce should have allowed Filati the opportunity to comment on the application of the Cemex methodology. See, e.g., Sigma Corp. v. United States,

17 CIT 1,288, 1,308, 841 F.Supp. 1,255, 1,267 (1993)("[I]t goes against all fairness for Commerce to say one thing in the preliminary results and then to have plaintiffs rely on this fact and not argue its case any further.").

Such an error, however, is harmless. See Intercargo Ins. Co. v. United States, 83 F.3d 391, 394 (Fed. Cir. 1996)(applying harmless error principle to review of agency action). The Court, on the record before it, does not see that Commerce could have applied the Cemex methodology any differently than it did. Cemex compelled Commerce to calculate NV using similar merchandise. See 133 F.3d at 902-04. Filati does not now claim that Commerce applied the methodology incorrectly, or that Commerce did not have the benefit of relevant evidence. See Filati's Br. at 30-33; Filati's Reply Br. at 17-18. Thus, the Court deems the error to be harmless and sustains Commerce's determination on this issue. See Intercargo, 83 F.3d at 394.

## IV.

## CONCLUSION

For the foregoing reasons, The Court sustains in part and remands in part. A separate Order will be entered accordingly.

_____
Richard W. Goldberg
JUDGE

Date: February 27, 2001
New York, New York